**UNITED STATES JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION**

| | |
|---|---|
| IN RE OPENAI COPYRIGHT INFRINGEMENT LITIGATION | MDL No. 3143 |

**DECLARATION OF MATTHEW TOPIC**

1.      My name is Matthew Topic.

2.      I am over the age of 18 and competent to provide this declaration.

3.      The following statements are made on my personal knowledge, and, if sworn as a witness, I can testify competently thereto.

4.      I am a partner at Loevy + Loevy.  I represent several plaintiffs in the cases at issue in the above-captioned proceeding.  In particular, I represent all the plaintiffs in the DMCA Cases: Raw Story Media, Inc., AlterNet Media, Inc., and The Intercept Media, Inc.  I also represent The Center for Investigative Reporting, Inc., which is one of the plaintiffs in the Consolidated News Cases.

5.      A true and correct copy of a June 6, 2024 order in *The Intercept Media, Inc. v. OpenAI, Inc.* is attached as Exhibit 1.

6.      A true and correct copy of the First Amended Complaint in *The Intercept Media, Inc. v. OpenAI, Inc.* is attached as Exhibit 2.

7.      A true and correct copy of a November 21, 2024 order in *The Intercept Media, Inc. v. OpenAI, Inc.* is attached as Exhibit 3.

8.      A true and correct copy of a redline between the proposed First Amended Complaint and the original complaint in *Raw Story Media, Inc. v. OpenAI, Inc.* is attached as

Exhibit 4.  This redline was filed in support of the *Raw Story* plaintiffs' motion for leave to amend the complaint.

9.      In *Raw Story*, the parties began issuing discovery in April and continued written discovery until Judge McMahon dismissed the case on November 7, 2024.

10.     A true and correct copy of OpenAI's responses and objections to the *Raw Story* plaintiffs' first set of requests for production of documents is attached as Exhibit 5.

11.     At the *Intercept* Rule 16 conference, Judge Rakoff orally stayed discovery pending his adjudication of the motions to dismiss.  He has not yet lifted that stay.

12.     In the *Intercept* case management plan, the parties proposed that they be ready for trial in approximately eleven months from the Rule 16 conference.  At the Rule 16 conference, Judge Rakoff indicated that while some additional time beyond his five-month default might be warranted, eleven months would be too long.

13.     After Judge Rakoff issued his decision on the motion to dismiss, the *Intercept* parties conferred by email about commencing discovery.  A true and correct copy of this email thread is attached as Exhibit 6.

14.     An attorney working at my direction used the Westlaw Litigation Analytics function on December 20, 2024, to research the amount of time it takes for the Southern District of New York and the Northern District of California to decide motions to certify a class.  According to that research, the Southern District of New York takes a median of 151 days, while the Northern District of California takes a median of 154 days.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.  Executed on January 2, 2025.

*/s/ Matthew Topic*

Matthew Topic

# Exhibit 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE INTERCEPT MEDIA, INC.,<br><br>      Plaintiff,<br><br>   -v-<br><br>OPENAI, INC., et al.<br><br>      Defendants. | 24-cv-1515 (JSR)<br><br>ORDER |

JED S. RAKOFF, U.S.D.J.:

On April 15, 2024, defendants OpenAI, Inc., OpenAI GP, LLC,
OpenAI, LLC, OpenAI OpCo LLC, OpenAI Global LLC, OAI Corporation, LLC,
OpenAI Holdings, LLC, and Microsoft Corporation filed motions to
dismiss the complaint in its entirety. See Def. Microsoft Notice of
Mot. and Mot. to Dismiss, ECF No. 49; Def. OpenAI Notice of Mot. to
Dismiss, ECF No. 52. Upon due consideration of the parties' written
submissions and oral argument, the Court has determined that plaintiff
should be granted leave to amend its complaint to attempt to rectify
some of the seeming lack of specificity in its current complaint,
provided it is done promptly. Accordingly, plaintiff must file an
amended complaint by Friday, June 21, 2024. Defendants may then file
a supplemental brief in support of their motions to dismiss by Monday,
July 8, 2024; the Court will treat defendants' already filed motions
as aimed at the amended complaint. Plaintiff may then file a

supplemental brief in opposition to the renewed motions to dismiss by Monday, July 15, 2024. The Court will then promptly rule on the motions.

    SO ORDERED.

New York, NY
June 6, 2024

JED S. RAKOFF, U.S.D.J.

# Exhibit 2

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE INTERCEPT MEDIA, INC., | No. 1:24-cv-01515-JSR |
| Plaintiff, | |
| v. | **FIRST AMENDED COMPLAINT** |
| OPENAI, INC., OPENAI GP, LLC, OPENAI, LLC, OPENAI OPCO LLC, OPENAI GLOBAL LLC, OAI CORPORATION, LLC, OPENAI HOLDINGS, LLC, and MICROSOFT CORPORATION | **JURY TRIAL DEMANDED** |
| Defendants. | |

1.     Plaintiff The Intercept Media, Inc., through its attorneys Loevy & Loevy, for its Complaint against the OpenAI Defendants and Defendant Microsoft, alleges the following:

2.     The Copyright Clause of the U.S. Constitution empowers Congress to protect works of human creativity.  The resulting legal protections encourage people to devote effort and resources to all manner of creative enterprises by providing confidence that creators' works will be shielded from unauthorized encroachment.

3.     In recognition that emerging technologies could be used to evade statutory protections, Congress passed the Digital Millennium Copyright Act in 1998.  The DMCA prohibits the removal of author, title, copyright, and terms of use information from protected works where there is reason to know that it would induce, enable, facilitate, or conceal a copyright infringement.  Unlike copyright infringement claims, which require copyright owners to incur significant and often prohibitive registration costs as a prerequisite to enforcing their copyrights, a DMCA claim does not require registration.

4. Generative artificial intelligence (AI) systems and large language models (LLMs) are trained using works created by humans. AI systems and LLMs ingest massive amounts of human creativity and use it to mimic how humans write and speak. These training sets have included hundreds of thousands, if not millions, of works of journalism.

5. Defendants are the companies responsible for the creation and development of the highly lucrative ChatGPT and Copilot AI products. According to the award-winning website Copyleaks, nearly 60% of the responses provided by Defendants' GPT-3.5 product in a study conducted by Copyleaks contained some form of plagiarized content, and over 45% contained text that was identical to pre-existing content.

6. When they populated their training sets with works of journalism, Defendants had a choice: they could train ChatGPT and Copilot using works of journalism with the copyright management information protected by the DMCA intact, or they could strip it away. Defendants chose the latter, and in the process, trained ChatGPT and Copilot not to acknowledge or respect copyright, not to notify ChatGPT and Copilot users when the responses they received were protected by journalists' copyrights, and not to provide attribution when using the works of human journalists.

7. Plaintiff The Intercept Media, Inc., is a news organization, and brings this lawsuit seeking actual damages and Defendants' profits, or statutory damages of no less than $2500 per violation.

**PARTIES**

8. The Intercept is an award-winning news organization dedicated to holding the powerful accountable through fearless, adversarial journalism. Its in-depth investigations and unflinching analysis focus on politics, war, surveillance, corruption, the environment, technology,

criminal justice, the media, and other issues. The Intercept has been recognized for its reporting on the U.S. drone program, criminal behavior in a major metropolitan police department, and toxic Teflon chemicals, among other work.

9.     The Intercept is a Delaware, non-stock, nonprofit organization. Its headquarters are located in New York, NY.

10.     Defendants are the organizations responsible for the creation, training, marketing, and sale of ChatGPT and Copilot AI products.

11.     Some of the Defendants consist of interrelated OpenAI entities, referred to herein collectively as the OpenAI Defendants. These include the following:

12.     OpenAI Inc. is a Delaware nonprofit corporation with a principal place of business in San Francisco, CA.

13.     OpenAI OpCo LLC is a Delaware limited liability company with a principal place of business in San Francisco, CA. OpenAI OpCo LLC is the sole member of OpenAI, LLC. Previously, OpenAI OpCo was known as OpenAI LP.

14.     OpenAI GP, LLC is a Delaware limited liability company with a principal place of business in San Francisco, CA. It is the general partner of OpenAI OpCo and controls OpenAI OpCo.

15.     OpenAI, LLC is a Delaware limited liability company with a principal place of business in San Francisco, CA. It owns some of the services or products operated by OpenAI.

16.     OpenAI Global LLC is a Delaware limited liability company with a principal place of business in San Francisco, CA. Its members are OAI Corporation LLC and Microsoft Corporation.

17.     OAI Corporation, LLC is a Delaware limited liability company with a principal place of business in San Francisco, CA.  Its sole member is OpenAI Holdings, LLC.

18.     OpenAI Holdings, LLC is a Delaware limited liability company with a principal place of business in San Francisco, CA. Its sole members are OpenAI, Inc. and Aestas Corporation.

19.     Microsoft Corporation is a Washington corporation with a principal place of business and headquarters in Redmond, Washington.

20.     Microsoft has described itself as being in partnership with OpenAI.  In a 2023 interview, Microsoft CEO Satya Nadella said that "ChatGPT and GPT family of models … is something that we've been partnered with OpenAI deeply now for multiple years."[1]

21.     Microsoft has invested billions of dollars in OpenAI Global LLC and will own a 49% stake in the company after its investment has been repaid.

22.     Microsoft provides the data center and bespoke supercomputing infrastructure used to train ChatGPT, which it created in collaboration with, and exclusively for, the OpenAI Defendants.  It also offers to the public its own AI product called Copilot that is powered by OpenAI's GPT models.

23.     In a 2023 interview, Microsoft's CEO stated that, "[i]f OpenAI disappeared tomorrow," Microsoft could still "continue the innovation" alone because, among other reasons, "we have the data, we have everything."[2]

---

[1] Microsoft CEO Satya Nadella's Big Bet on AI, *WSJ Podcasts* (Jan. 18, 2023), https://www.wsj.com/podcasts/the-journal/microsoft-ceo-satya-nadella-big-bet-on-ai/b0636b90-08bd-4e80-9ae3-092acc47463a.

[2] Intelligencer Staff, Satya Nadella on Hiring the Most Powerful Man in AI, *Intelligencer*, (Nov. 21, 2023), https://nymag.com/intelligencer/2023/11/on-with-kara-swisher-satya-nadella-on-hiring-sam-altman.html.

- 4 -

24.     Upon information and belief based on the relationship between Defendants and the statements discussed above, Microsoft hosts ChatGPT training sets and provides access to those training sets to one or more of the OpenAI Defendants, and some of those training sets were created by the OpenAI Defendants and provided to Microsoft.

## JURISDICTION AND VENUE

25.     The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a) because this action arises under the Copyright Act of 1976, 17 U.S.C. § 101, et seq., as amended by the Digital Millennium Copyright Act.

26.     Jurisdiction over Defendants is proper because they have purposefully availed themselves of New York to conduct their business.  Defendants maintain offices and employ staff in New York who, upon information and belief, were engaged in training and/or marketing of ChatGPT, and thus in the removal of Plaintiff's copyright management information as discussed in this Complaint and/or the sale of products to New York residents resulting from that removal. Defendants consented to personal jurisdiction in this Court in at least *Authors Guild v. OpenAI Inc.*, 23-cv-08292.  They further waived any challenge to personal jurisdiction in this case by not raising any such challenge in their Motions to Dismiss.

27.     Because Plaintiff's principal place of business is in this District, Defendants could reasonably foresee that the injuries alleged in this Complaint would occur in this District.

28.     Venue is proper under 28 U.S.C. § 1400(a) because Defendants or their agents reside or may be found in this District.

29.     Venue is also proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the acts or omissions giving rise to Plaintiff's claims occurred in this District.  Specifically, Defendants

employ staff in New York who, on information and belief, were engaged in the activities alleged
in this Complaint.

30.     Defendants consented to venue in this Court in at least *Authors Guild v. OpenAI
Inc.*, 23-cv-08292.  They further waived any challenge to venue in this case by not raising any such
challenge in their Motions to Dismiss.

## PLAINTIFF'S COPYRIGHT-PROTECTED WORKS OF JOURNALISM

31.     Plaintiff's copyrighted works of journalism are published on Plaintiff's website,
theintercept.com, and are conveyed to the public with author, title, copyright, and terms of use
information.

32.     Plaintiff owns copyrights to all the articles listed in Exhibit 1.

33.     Plaintiff's copyright-protected works are the result of significant investments by
Plaintiff in the human and other resources necessary to report on the news.

## DEFENDANTS' INCLUSION OF PLAINTIFF'S WORKS IN THEIR TRAINING SETS AND REMOVAL OF COPYRIGHT MANAGEMENT INFORMATION

34.     Defendants' generative AI products utilize a "large language model," or "LLM."
The different versions of GPT are examples of LLMs. An LLM, including those that power
ChatGPT and Copilot, take text prompts as inputs and emit outputs to predict responses that are
likely to follow a given the potentially billions of input examples used to train it.

35.     LLMs arrive at their outputs as the result of their training on works written by
humans, which are often protected by copyright.  They collect these examples in training sets.

36.     When assembling training sets, LLM creators, including Defendants, first identify
the works they want to include.  They then encode the work in computer memory as numbers
called "parameters."

37.     Defendants have not published the contents of the training sets used to train any version of ChatGPT, but have disclosed information about those training sets prior to GPT-4.[3] Beginning with GPT-4, Defendants have been fully secret about the training sets used to train that and later versions of ChatGPT.  Plaintiff's allegations about Defendants' training sets are therefore based upon an extensive review of publicly available information regarding earlier versions of ChatGPT and consultations with a data scientist employed by Plaintiff's counsel to analyze that information and provide insights into the manner in which AI is developed and functions.

38.     Microsoft has built its own AI product, called Copilot, which uses Microsoft's Prometheus technology.  Prometheus combines the Bing search product with the OpenAI Defendants' GPT models into a component called Bing Orchestrator.  When prompted, Copilot responds to user queries using Bing Orchestrator by providing AI-rewritten abridgements or regurgitations of content found on the internet.[4]

39.     Earlier versions of ChatGPT (prior to GPT-4) were trained using at least the following training sets: WebText, WebText2, and sets derived from Common Crawl.

40.     WebText and WebText2 were created by the OpenAI Defendants.  They are collections of all outbound links on the website Reddit that received at least three "karma."[5]  On Reddit, a karma indicates that users have generally approved the link.  The difference between the datasets is that WebText2 involved scraping links from Reddit over a longer period of time.  Thus, WebText2 is an expanded version of WebText.

---

[3] Plaintiff collectively refers to all versions of ChatGPT as "ChatGPT" unless a specific version is specified.
[4] https://blogs.bing.com/search-quality-insights/february-2023/Building-the-New-Bing
[5] Alec Radford et al, Language Models are Unsupervised Multitask Learners, 3, https://cdn.openai.com/better-language-models/language_models_are_unsupervised_multitask_learners.pdf

41.     The OpenAI Defendants have published a list of the top 1,000 web domains present in the WebText training set and their frequency.  According to that list, 6,484 distinct URLs from Plaintiff's web domain were included in WebText.[6]

42.     Defendants have a record of, and are aware, of each URL that was included in each of their training sets.

43.     Joshua C. Peterson, currently an assistant professor in the Faculty of Computing and Data Sciences at Boston University, and two computational cognitive scientists with PhDs from U.C. Berkeley, created an approximation of the WebText dataset, called OpenWebText, by also scraping outbound links from Reddit that received at least three "karma," just like the OpenAI Defendants did in creating WebText.[7]  They published the results online.  A data scientist employed by Plaintiff's counsel then analyzed those results.  OpenWebText contains 5,026 distinct URLs from Plaintiff's web domain.  A list of these URLs and a description of the analysis is attached as Exhibit 2.

44.     Upon information and belief, there are different numbers of Plaintiff's articles in WebText and OpenWebText at least in part because the scrapes occurred on different dates.

45.     OpenAI has explained that, in developing WebText, it used sets of algorithms called Dragnet and Newspaper to extract text from websites.[8]  Upon information and belief, OpenAI used these two extraction methods, rather than one method, to create redundancies in case one method experienced a bug or did not work properly in a given case.  Applying two methods

---

[6] https://github.com/openai/gpt-2/blob/master/domains.txt.

[7] https://github.com/jcpeterson/openwebtext/blob/master/README.md.

[8] Alec Radford et al., Language Models are Unsupervised Multitask Learners, 3 https://cdn.openai.com/better-language-models/language_models_are_unsupervised_multitask_learners.pdf.

rather than one would lead to a training set that is more consistent in the kind of content it contains, which is desirable from a training perspective.

46.     Dragnet's algorithms are designed to "separate the main article content" from other parts of the website, including "footers" and "copyright notices," and allow the extractor to make further copies only of the "main article content."[9]  Dragnet is also unable to extract author and title information.  Put differently, copies of news articles made by Dragnet necessarily do not contain author, title, copyright notices, and footers.

47.     Like Dragnet, the Newspaper algorithms are incapable of extracting copyright notices and footers.  Further, a user of Newspaper has the choice to extract or not extract author and title information.  On information and belief, the OpenAI Defendants chose not to extract author and title information because they desired consistency with the Dragnet extractions, and Dragnet is unable to extract author and title information.

48.     In applying the Dragnet and Newspaper algorithms while assembling the WebText dataset, the OpenAI Defendants removed Plaintiff's author, title, copyright notice, and terms of use information, the latter of which is contained in the footers of Plaintiff's websites.

49.     Upon information and belief, the OpenAI Defendants, when using Dragnet and Newspaper, first download and save the relevant webpage before extracting data from it.  This is at least because, when they use Dragnet and Newspaper, they likely anticipate a possible future need to regenerate the dataset (*e.g.*, if the dataset becomes corrupted), and it is cheaper to save a copy than it is to recrawl all the data.

---

[9] Matt McDonnell, Benchmarking Python Content Extraction Algorithms (Jan. 29, 2015), https://moz.com/devblog/benchmarking-python-content-extraction-algorithms-dragnet-readability-goose-and-eatiht.

50.     Because, by the time of its scraping, Dragnet and Newspaper were publicly known to remove author, title, copyright notices, and footers, and given that OpenAI employs highly skilled data scientists who would know how Dragnet and Newspaper work, the OpenAI Defendants intentionally and knowingly removed this copyright management information while assembling WebText.

51.     A data scientist employed by Plaintiff's counsel applied the Dragnet code to three of Plaintiff's URLs contained in OpenWebText.  The results are attached as Exhibit 3.  The resulting copies, whose text is substantively identical to the original (*e.g.*, identical except for the seemingly random addition of an extra space between two words, or the exclusion of a description associated with an embedded photo), lack the author, title, copyright notice, and terms of use information with which they were conveyed to the public.

52.     A data scientist employed by Plaintiff's counsel also applied the Newspaper code to three of Plaintiff's URLs contained in OpenWebText.  The data scientist applied the version of the code that enables the user not to extract author and title information based on the reasonable assumption that the OpenAI Defendants desired consistency with the Dragnet extractions.  The results are attached as Exhibit 4.  The resulting copies, whose text is substantively identical to the original, lack the author, title, copyright notice, and terms of use information with which they were conveyed to the public.

53.     The absence of author, title, copyright notice, and terms of use information from the copies of Plaintiff's articles generated by applying the Dragnet and Newspaper codes—codes OpenAI has admitted to have intentionally used when assembling WebText—further corroborates that the OpenAI Defendants intentionally removed author, title, copyright notice, and terms of use information from Plaintiff's copyright-protected news articles.

54.     Upon information and belief, the OpenAI Defendants have continued to use the same or similar Dragnet and Newspaper text extraction methods when creating training sets for every version of ChatGPT since GPT-2.  This is at least because the OpenAI Defendants have admitted to using these methods for GPT-2 and have neither publicly disclaimed their use for later version of ChatGPT nor publicly claimed to have used any other text extraction methods for those later versions.

55.     Common Crawl is a data set that consists of a scrape of most of the internet created by a non-profit research institute, also called Common Crawl.  ChatGPT was trained on a version of Common Crawl, in addition to the WebText and WebText2 training sets.

56.     To train GPT-2, OpenAI downloaded Common Crawl data from the third party's website and filtered it to include only certain works, such as those written in English.[10]

57.     Google has published instructions on how to replicate a dataset called C4, a monthly snapshot of filtered Common Crawl data that Google used to train its own AI models.  Upon information and belief, based on the similarity of Defendants' and Google's goals in training AI models, C4 is substantially similar to the filtered versions of Common Crawl used to train ChatGPT.  The Allen Institute for AI, a nonprofit research institute launched by Microsoft cofounder Paul Allen, followed Google's instructions and published its recreation of C4 online.[11]

58.     A data scientist employed by Plaintiff's counsel analyzed this recreation.  It contains 2,753 distinct URLs from Plaintiff's web domain.  The vast majority of these URLs contain The Intercept's copyright-protected news articles.  None of the news articles contains copyright notice or terms of use information.  The vast majority lack both author and title

---

[10] Tom B. Brown et al, Language Models are Few-Shot Learners, 14 (July 22, 2020), https://arxiv.org/pdf/2005.14165.
[11] https://huggingface.co/datasets/allenai/c4.

information.  In some cases, the articles are reproduced entirely verbatim, while in others a small number of paragraphs is omitted.

59.     As a representative sample, the text of three of the articles as they appear in the C4 set is attached as Exhibit 5.  None of these articles contains the author, title, copyright notice, or terms of use information with which it was conveyed to the public.  In each case, the article's text in C4 is substantively identical to the text from Plaintiff's website.

60.     Plaintiff has not licensed or otherwise permitted Defendants to include any of its works in their training sets.

61.     Defendants' actions in downloading thousands of Plaintiff's articles without permission infringes Plaintiff's copyright, more specifically, the right to control reproductions of copyright-protected works.

### DEFENDANTS' REGURGITATION AND MIMICKING OF COPYRIGHT-PROTECTED WORKS OF JOURNALISM

62.     ChatGPT and Copilot provide responses to questions or other prompts. Their ability to provide these responses is the key value proposition of Defendants' products, which they are able to sell to their customers for enormous sums of money, soon likely to be in the billions of dollars.

63.     To train ChatGPT, the OpenAI Defendants retain users' chat histories with ChatGPT unless the user takes the affirmative step of disabling that feature.[12]  Thus, upon information and belief, the OpenAI Defendants possess a repository of every regurgitation of Plaintiff's works apart from those whose storage users have affirmatively disabled.

---

[12] New ways to manage your data in ChatGPT (Apr. 25, 2023), https://openai.com/index/new-ways-to-manage-your-data-in-chatgpt/.

64.     At least some of the time, ChatGPT and Copilot provide or have provided responses to users that regurgitate verbatim or nearly verbatim copyright-protected works of journalism without providing author, title, copyright, or terms of use information contained in those works. Examples of such regurgitations are included in Exhibit J to the Complaint in *Daily News, LP v. Microsoft Corporation*, No. 24-cv-03285 (S.D.N.Y. Apr. 30, 2024).

65.     At least some of the time, ChatGPT and Copilot provide or have provided responses to users that mimic significant amounts of material from copyright-protected works of journalism without providing any author, title, copyright, or terms of use information contained in those works.  For example, if a user asks ChatGPT or Copilot about a current event or the results of a work of investigative journalism, ChatGPT or Copilot will provide responses that mimic copyright-protected works of journalism that covered those events, not responses that are based on any journalism efforts by Defendants.

66.     At least some of the time, ChatGPT memorizes and regurgitates material.[13]  The OpenAI Defendants have publicly admitted their knowledge of this fact.  The OpenAI Defendants have also effectively admitted that regurgitation of copyrighted works is infringement: when Plaintiff attempted to obtain the same regurgitations set forth in the *Daily News* case using the same methodology, Plaintiff received in one instance a message stating, "I'm sorry, but I can't generate the original ending for the article or any copyrighted content."  Thus, upon information and belief, the OpenAI Defendants have recently changed ChatGPT to reduce regurgitations for copyright reasons.

---

[13] OpenAI and journalism (Jan. 8, 2024), https://openai.com/index/openai-and-journalism/.

67.     Nonetheless, ChatGPT has produced regurgitations of Plaintiff's copyright-protected works.  Examples of three such regurgitations, along with the prompts that generated them, are attached as Exhibit 6.

**DEFENDANTS' INTENTIONAL REMOVAL OF COPYRIGHT MANAGEMENT INFORMATION FROM PLAINTIFF'S WORKS IN THEIR TRAINING SETS**

68.     ChatGPT and Copilot do not have any independent knowledge of the information provided in their responses. Rather, to service Defendants' paying customers, ChatGPT and Copilot instead repackage, among other material, the copyrighted journalism work product that was developed and created by Plaintiff, and others, at often considerable their expense.

69.     When providing responses, ChatGPT and Copilot give the impression that they are an all-knowing, "intelligent" source of the information being provided, when in reality, the responses are frequently based on copyrighted works of journalism that ChatGPT and Copilot simply mimic.

70.     If ChatGPT and Copilot were trained on works of journalism that included the original author, title, copyright notice, and terms of use information, they would have learned to communicate that information when providing responses to users unless Defendants trained them otherwise.

71.     Based on the information described above, thousands of Plaintiff's copyrighted works were included in Defendants' training sets without the author, title, copyright notice, and terms of use information that Plaintiff conveyed in publishing them.

72.     Based on the information above, including the OpenAI Defendants' admission to using the Dragnet and Newspaper extraction methods, which remove author, title, copyright notice, and terms of use information from copyright-protected news articles published online, the

OpenAI Defendants intentionally removed author, title, copyright notice, and terms of use information from Plaintiff's copyrighted works in creating ChatGPT training sets.

## DEFENDANTS' COLLABORATION IN INFRINGING PLAINTIFF'S COPYRIGHT, UNLAWFULLY REMOVING COPYRIGHT MANAGEMENT INFORMATION, AND UNLAWFULLY DISTRIBUTING PLAINTIFF'S WORKS WITH COPYRIGHT MANAGEMENT INFORMATION REMOVED

73. Based on the publicly available information described above, including the admission from Microsoft's CEO that "we have the data, we have everything," Defendant Microsoft has created, without Plaintiff's permission, its own copies of Plaintiff's copyright-protected works of journalism.

74. Based on the publicly available information described above, including information showing that Defendant Microsoft created and hosted the data centers used to develop ChatGPT and information regarding Microsoft's own Copilot, Defendant Microsoft intentionally removed author, title, copyright notice, and terms of use information from Plaintiff's copyrighted works in creating ChatGPT and Copilot training sets.

75. Based on publicly available information regarding the relationship between Defendant Microsoft and the OpenAI Defendants, and Defendant Microsoft's provision of database and computing resources to the OpenAI Defendants, Defendant Microsoft has shared copies of Plaintiff's works from which author, title, copyright notice, and terms of use information had been removed, with the OpenAI Defendants as part of Defendants' efforts to develop ChatGPT and Copilot.

76. Based on publicly available information regarding the working relationship between Defendant Microsoft and the OpenAI Defendants, including the creation of training sets by the OpenAI Defendants such as WebText and WebText2, the OpenAI Defendants have shared copies of Plaintiff's works from which author, title, copyright notice, and terms of use information

had been removed, with Defendant Microsoft as part of Defendants' efforts to develop ChatGPT and Copilot.

**DEFENDANTS' ACTUAL AND CONSTRUCTIVE
KNOWLEDGE OF THEIR VIOLATIONS**

77.     The OpenAI Defendants have acknowledged that use of copyright-protected works to train ChatGPT requires a license to that content. Recognizing that obligation, the OpenAI Defendants have entered into agreements with large copyright owners such as Associated Press, the Atlantic, Axel Springer, Dotdash Meredith, Financial Times, News Corp, and Vox Media to obtain licenses to include those entities' copyright-protected works in Defendants' LLM training data.

78.     The OpenAI Defendants are also in licensing talks with other copyright owners in the news industry, but have offered no compensation to Plaintiff.

79.     In a May 29, 2024 interview, OpenAI's Chief of Intellectual Property and Content, Tom Rubin, stated that these deals focus on "the display of news content and use of the tools and tech," and are thus "largely not" about training.[14]  This admission, while qualified, confirms that these deals involve training, at least in part.

80.     The OpenAI Defendants created tools in late 2023 to allow copyright owners to block their work from being incorporated into training sets.  This further corroborates that the OpenAI Defendants had reason to know that use of copyrighted material in their training sets without permission or license is copyright infringement.

---

[14] Charlotte Tobitt, OpenAI content boss: 'Incumbent' on us to help small publishers, not just the giants, *PressGazette* (May 30, 2024), https://pressgazette.co.uk/platforms/openai-tom-rubin-publishers-news/.

81.     The creation of such tools also corroborates that the OpenAI Defendants had reason to know that their copyright infringement is enabled, facilitated, and concealed by their removal of author, title, copyright, and terms of use information from their training sets.

82.     Defendants had reason to know that the removal of author, title, copyright notice, and terms of use information from copyright-protected works and their use in training ChatGPT would result in ChatGPT providing responses to ChatGPT users that incorporated or regurgitated material verbatim from copyrighted works in creating responses to users, without revealing that those works were subject to Plaintiff's copyrights.  This is at least because Defendants were aware that ChatGPT responses are the product of its training sets and that ChatGPT generally would not know any author, title, copyright notice, and terms of use information that was not included in training sets.

83.     Defendants had reason to know that users of ChatGPT would further distribute the results of ChatGPT responses.  This is at least because Defendants promote ChatGPT as a tool that can be used by a user to generate content for a further audience.

84.     Defendants had reason to know that users of ChatGPT would be less likely to distribute ChatGPT responses if they were made aware of the author, title, copyright notice, and terms of use information applicable to the material used to generate those responses.  This is at least because Defendants were aware that at least some likely users of ChatGPT respect the copyrights of others or fear liability for copyright infringement.

85.     Defendants had reason to know that ChatGPT would be less popular and would generate less revenue if users believed that ChatGPT responses violated third-party copyrights or if users were otherwise concerned about further distributing ChatGPT responses.  This is at least because Defendants were aware that Defendants derive revenue from user subscriptions, that at

least some likely users of ChatGPT respect the copyrights of others or fear liability for copyright infringement, and that such users would not pay to use a product that might result in copyright liability or did not respect the copyrights of others.

86.     If a commercial user of Defendants' ChatGPT and Copilot products is sued for copyright infringement, Defendants have committed to paying the user's costs in defending against the infringement claim, and to indemnifying the user for an adverse judgment or settlement.  These commitments apply only if the user uses the product as advertised.  In particular, Microsoft's "Copilot Copyright Commitment" applies only if the user "used the guardrails and content filters we have built into our products,"[15] and OpenAI's "Copyright Shield" does not apply if the user "disabled, ignored, or did not use any relevant citation, filtering or safety features or restrictions provided by OpenAI."[16]   Thus, Defendants know or have reason to know that ChatGPT and Copilot users are capable of infringing and likely to infringe copyright even when used according to terms specified by Defendants.

### Count I – Violation of 17 U.S.C. § 1202(b)(1) by OpenAI Defendants

87.     The above paragraphs are incorporated by reference into this Count.

88.     Plaintiff is the owner of copyrighted works of journalism that contain author, title, copyright notice information, and terms of use information.

89.     Upon information and belief, the OpenAI Defendants created copies of Plaintiff's works of journalism with author information removed and included them in training sets used to train ChatGPT.

---

[15] https://www.microsoft.com/en-us/licensing/news/microsoft-copilot-copyright-commitment.
[16] https://openai.com/policies/service-terms/.

Case 1:24-cv-01514-JSR Document 51-87 Filed 06/21/24 Page 26 of 96

90. Upon information and belief, the OpenAI Defendants created copies of Plaintiff's works of journalism with title information removed and included them in training sets used to train ChatGPT.

91. Upon information and belief, the OpenAI Defendants created copies of Plaintiff's works of journalism with copyright notice information removed and included them in training sets used to train ChatGPT.

92. Upon information and belief, the OpenAI Defendants created copies of Plaintiff's works of journalism with terms of use information removed and included them in training sets used to train ChatGPT.

93. The OpenAI Defendants had reason to know that inclusion in their training sets of Plaintiff's works of journalism without author, title, copyright, and terms of use information would induce ChatGPT to provide responses to users that incorporated material from Plaintiff's copyright-protected works or regurgitated copyright-protected works verbatim or nearly verbatim.

94. The OpenAI Defendants had reason to know that inclusion in their training sets of Plaintiff's works of journalism without author, title, copyright, and terms of use information would induce ChatGPT users to distribute or publish ChatGPT responses that utilized Plaintiff's copyright-protected works of journalism that such users would not have distributed or published if they were aware of the author, title, copyright, or terms of use information.

95. The OpenAI Defendants had reason to know that inclusion in their training sets of Plaintiff's works of journalism without author, title, copyright, and terms of use information would enable copyright infringement by ChatGPT and ChatGPT users.

- 19 -

96. The OpenAI Defendants had reason to know that inclusion in their training sets of Plaintiff's works of journalism without author, title, copyright, and terms of use information would facilitate copyright infringement by ChatGPT and ChatGPT users.

97. The OpenAI Defendants had reason to know that inclusion in their training sets of Plaintiff's works of journalism without author, title, copyright, and terms of use information would conceal copyright infringement by Defendants, ChatGPT, and ChatGPT users.

**Count II – Violation of 17 U.S.C. § 1202(b)(3) by OpenAI Defendants**

98. The above paragraphs are incorporated by reference into this Count.

99. Upon information and belief, the OpenAI Defendants shared copies of Plaintiff's works without author, title, copyright, and terms of use information with Defendant Microsoft in connection with the development of ChatGPT and Copilot.

**Count III – Violation of 17 U.S.C. § 1202(b)(1) by Defendant Microsoft**

100. The above paragraphs are incorporated by reference into this Count.

101. Upon information and belief, Defendant Microsoft created copies of Plaintiff's works of journalism with author information removed and included them in training sets used to train ChatGPT and Bing AI products.

102. Upon information and belief, Defendant Microsoft created copies of Plaintiff's works of journalism with title information removed and included them in training sets used to train ChatGPT and Bing AI products.

103. Upon information and belief, Defendant Microsoft created copies of Plaintiff's works of journalism with copyright notice information removed and included them in training sets used to train ChatGPT and Bing AI products.

104. Upon information and belief, Defendant Microsoft created copies of Plaintiff's works of journalism with terms of use information removed and included them in training sets used to train ChatGPT and Bing AI products.

105. Defendant Microsoft had reason to know that inclusion in training sets of Plaintiff's works of journalism without author, title, copyright, and terms of use information would induce ChatGPT and Bing AI products to provide responses to users that incorporated material from Plaintiff's copyright-protected works or regurgitated copyright-protected works verbatim or nearly verbatim.

106. Defendant Microsoft had reason to know that inclusion in training sets of Plaintiff's works of journalism without author, title, copyright, and terms of use information would induce ChatGPT and Bing AI product users to distribute or publish responses that utilized Plaintiff's copyright-protected works of journalism that such users would not have distributed or published if they were aware of the author, title, copyright, or terms of use information.

107. Defendant Microsoft had reason to know that inclusion in training sets of Plaintiff's works of journalism without author, title, copyright, and terms of use information would enable copyright infringement by ChatGPT, Bing AI, and ChatGPT and Bing AI users.

108. Defendant Microsoft had reason to know that inclusion in training sets of Plaintiff's works of journalism without author, title, copyright, and terms of use information would facilitate copyright infringement by ChatGPT, Bing, AI, and ChatGPT and Bing AI users.

109. Defendant Microsoft had reason to know that inclusion in training sets of Plaintiff's works of journalism without author, title, copyright, and terms of use information would conceal copyright infringement by Defendants, ChatGPT, Bing AI, and ChatGPT and Bing AI users.

**Count IV – Violation of 17 U.S.C. § 1202(b)(3) by Defendant Microsoft**

110.    The above paragraphs are incorporated by reference into this Count.

111.    Upon information and belief, Defendant Microsoft shared copies of Plaintiff's works without author, title, copyright, and terms of use information with the OpenAI Defendants in connection with the development of ChatGPT and Copilot.

## PRAYER FOR RELIEF

Plaintiff seeks the following relief:

(i)     Either statutory damages or the total of Plaintiff's damages and Defendants' profits, to be elected by Plaintiff;

(ii)    An injunction requiring Defendants to remove all copies of Plaintiff's copyrighted works from which author, title, copyright, and terms of use information was removed from their training sets and any other repositories;

(iii)   Attorney fees and costs.

## JURY DEMAND

Plaintiff demands a jury trial.

RESPECTFULLY SUBMITTED,

*/s/ Stephen Stich Match*

Jonathan Loevy (*pro hac vice*)
Michael Kanovitz (*pro hac vice*)
Lauren Carbajal (*pro hac vice*)
Stephen Stich Match (No. 5567854)
Matthew Topic (*pro hac vice*)

LOEVY & LOEVY
311 North Aberdeen, 3rd Floor
Chicago, IL 60607
312-243-5900 (p)
312-243-5902 (f)
jon@loevy.com
mike@loevy.com
carbajal@loevy.com
match@loevy.com
matt@loevy.com

June 21, 2024

# Exhibit 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
┌─────────────────────────────────────────┐
│  THE INTERCEPT MEDIA, INC.,              │
│                                          │
│            Plaintiff,                    │
│                                          │
│       -v-                                │
│                                          │
│  OPENAI, INC., et al.,                   │
│                                          │
│            Defendants.                   │
│                                          │
└─────────────────────────────────────────┘
```

24-cv-1515 (JSR)

ORDER

JED S. RAKOFF, U.S.D.J.:

On June 21, 2024, plaintiff The Intercept Media, Inc. ("The Intercept") filed an amended complaint in compliance with the schedule set out in the Court's order issued on June 6, 2024. See ECF Nos. 81, 87. On July 8, 2024, defendants OpenAI[1] and Microsoft Corporation ("Microsoft") renewed their previously filed motions to dismiss and submitted supplemental briefs in further support of their motions. See ECF Nos. 88, 89. One week later, The Intercept submitted a supplemental brief in opposition to defendants' motions. See ECF No. 90.

On November 1, 2024, the Court held oral argument on defendants' motions and advised counsel for all parties that it would issue a bottom-line order by November 22, 2024. Accordingly, the Court (1) grants Microsoft's motion in full and with prejudice, and (2) grants OpenAI's motion in part, dismissing The Intercept's claim under 17

---

[1] The Intercept sued OpenAI, Inc.; OpenAI GP, LLC; OpenAI, LLC; OpenAI OpCo LLC; OpenAI Global LLC; OAI Corporation, LLC; and OpenAI Holdings, LLC. Because The Intercept's allegations do not distinguish among these entities, this Order generally refers to "OpenAI."

U.S.C. § 1202(b)(3) with prejudice but allowing The Intercept's claim under 17 U.S.C. § 1202(b)(1) to proceed past the motion-to-dismiss stage.

An Opinion explaining the reasons for this ruling will issue in due course. The Clerk of Court is respectfully directed to close docket entry numbers 49 and 52.

SO ORDERED.

New York, NY
November 2l, 2024

_____
JED S. RAKOFF, U.S.D.J.

# Exhibit 4

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RAW STORY MEDIA, INC., ALTERNET MEDIA, INC., <br><br> Plaintiffs, <br><br> v. <br><br> OPENAI, INC., OPENAI GP, LLC, OPENAI, LLC, OPENAI OPCO LLC, OPENAI GLOBAL LLC, OAI CORPORATION, LLC, OPENAI HOLDINGS, LLC, <br><br> Defendants. | Civil Action No. <br> ————————24-01514-CM <br><br> **FIRST AMENDED** COMPLAINT <br><br> **JURY TRIAL DEMANDED** |

1. Plaintiffs Raw Story Media, Inc. and AlterNet Media, Inc., through their attorneys Loevy & Loevy, for their Complaint against the OpenAI Defendants, allege the following:

2. The Copyright Clause of the U.S. Constitution empowers Congress to protect works of human creativity. The resulting legal protections encourage people to devote effort and resources to all manner of creative enterprises by providing confidence that creators' works will be shielded from unauthorized encroachment.

3. In recognition that emerging technologies could be used to evade statutory protections, Congress passed the Digital Millennium Copyright Act in 1998. The DMCA prohibits the removal of author, title, copyright, and terms of use information from protected works where there is reason to know that it would induce, enable, facilitate, or conceal a copyright infringement. Unlike copyright infringement claims, which require copyright owners to incur significant and often prohibitive registration costs as a prerequisite to enforcing their copyrights, a DMCA claim does not require registration.

4.    Generative artificial intelligence (AI) systems and large language models (LLMs) are trained using works created by humans.  AI systems and LLMs ingest massive amounts of human creativity and use it to mimic how humans write and speak. These training sets have included hundreds of thousands, if not millions, of works of journalism.

5.    Defendants are the companies primarily responsible for the creation and development of the highly lucrative ChatGPT AI products.  According to the award-winning website Copyleaks, nearly 60% of the responses provided by Defendants' GPT-3.5 product in a study conducted by Copyleaks contained some form of plagiarized content, and over 45% contained text that was identical to pre-existing content.

6.    When they populated their training sets with works of journalism, Defendants had a choice: they could train ChatGPT using works of journalism with the copyright management information protected by the DMCA intact, or they could strip it away.  Defendants chose the latter, and in the process, trained ChatGPT not to acknowledge or respect copyright, not to notify ChatGPT users when the responses they received were protected by journalists' copyrights, and not to provide attribution when using the works of human journalists.

7.    Plaintiffs Raw Story and AlterNet are news organizations, and bring this lawsuit seeking actual damages and Defendants' profits, or statutory damages of no less than $2500 per violation.

## PARTIES

8.    For over two decades, Raw Story has published award-winning investigative journalism, breaking news, and bold opinion columns.  Raw Story publishes to more than ten million readers each month and has more than 1,000,000 daily readers.  It is the largest independent

progressive political news website in America and was named the best news/political blog in America by *Editor & Publisher* in 2022 and 2023.

9.   Among other important work, Raw Story has received *Editor & Publisher* (EPPY), Society of Professional Journalists, Fair Media Council, and ION awards for its reporting on white nationalism, the January 6 riots, South Dakota governor Kristi Noem's use of a state airplane for non-official purposes, and inappropriate Congressional stock trading. Raw Story reporters produce timely, illuminating work at great risk and cost to enrich understanding of critical issues and undermine threats to civil society.

10.  As one example of the risks taken by Raw Story reporters in bringing the news to the public—risks never faced by AI bots—members of a neo-Nazi group showed up at the home of a Raw Story reporter who covers extremism and white supremacy in America.  *See* Washington Post, *A reporter investigated neo-Nazis. Then they came to his house in masks.* (Feb. 20, 2024), https://www.washingtonpost.com/style/media/2024/02/20/raw-story-neo-nazi-journalist-house/.

11.  Raw Story is a Massachusetts corporation with its headquarters in Miami Beach, Florida.

12.  AlterNet is a three-time Webby award-winning publisher with a focus on civil rights, social justice, culture, health, and the environment. For 25 years, AlterNet's reporters have chased political news, and its opinion writers have probed the intersection of politics, science, and religion.

13.  AlterNet is a Delaware corporation with its headquarters in Miami Beach, Florida.

14.  Together, Plaintiffs have published more than 400,000 breaking news features, investigative news articles and opinion columns as a result of their considerable investments of time and resources.

15.     Defendants are the inter-related organizations primarily responsible for the creation, training, marketing, and sale of ChatGPT AI products.

16.     OpenAI Inc. is a Delaware nonprofit corporation with a principal place of business in San Francisco, CA.

17.     OpenAI OpCo LLC is a Delaware limited liability company with a principal place of business in San Francisco, CA.  OpenAI OpCo LLC is the sole member of OpenAI, LLC.  Previously, OpenAI OpCo was known as OpenAI LP.

18.     OpenAI GP, LLC is a Delaware limited liability company with a principal place of business in San Francisco, CA.  It is the general partner of OpenAI OpCo and controls OpenAI OpCo.

19.     OpenAI, LLC is a Delaware limited liability company with a principal place of business in San Francisco, CA.  It owns some of the services or products operated by OpenAI.

20.     OpenAI Global LLC is a Delaware limited liability company with a principal place of business in San Francisco, CA.

21.     OAI Corporation, LLC is a Delaware limited liability company with a principal place of business in San Francisco, CA.  Its sole member is OpenAI Holdings, LLC.

22.     OpenAI Holdings, LLC is a Delaware limited liability company with a principal place of business in San Francisco, CA. Its sole members are OpenAI, Inc. and Aestas Corporation.

## JURISDICTION AND VENUE

23.     The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a) because this action arises under the Copyright Act of 1976, 17 U.S.C. § 101, et seq., as amended by the Digital Millennium Copyright Act.

24.     Jurisdiction over Defendants is proper because they have purposefully availed themselves of New York to conduct their business.  OpenAI maintains offices and employs staff in New York who, on information and belief, were engaged in training and/or marketing OpenAI's GenAI systems and LLMs, and thus in the removal of Plaintiffs' copyright management information as discussed in this Complaint and/or the sale of products to New York residents resulting from that removal.  Defendants ~~consented to~~ did not contest personal jurisdiction in ~~this Court in at least *Authors Guild v. OpenAI Inc.*, 23-cv-08292~~ their Motion to Dismiss.

25.     Venue is proper under 28 U.S.C. § 1400(a) because Defendants or their agents reside or may be found in this District.

26.     Venue is also proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the acts or omissions giving rise to Plaintiffs' claims occurred in this District.  Specifically, OpenAI employs staff in New York who, on information and belief, were engaged in the activities alleged in this Complaint.

27.     ~~The OpenAI~~ Defendants ~~consented to~~ did not contest venue in ~~this Court~~ their Motion to Dismiss.

**PLAINTIFFS' COPYRIGHT-PROTECTED WORKS OF JOURNALISM**

28.     Plaintiffs' copyrighted works of journalism are published on Plaintiffs' websites, rawstory.com and alternet.org respectively, and are conveyed to the public with author, title, and copyright notice information.

~~27.~~29.  Plaintiffs own copyrights to all the Raw Story articles listed in ~~at least *Authors Guild*~~ Exhibit 1 and the AlterNet articles listed in Exhibit 2 ~~*v. OpenAI Inc.*, 23-cv-08292~~.

**DEFENDANTS' DMCA VIOLATIONS**

30.    Defendants have kept secret the specific content used to train allPlaintiffs' copyright-protected works are the result of significant investment by Plaintiffs in the human and other resources necessary to report on the news.

**DEFENDANTS' INCLUSION OF PLAINTIFFS' WORKS IN THEIR TRAINING
SETS AND REMOVAL OF COPYRIGHT MANAGEMENT INFORMATION**

31.     Defendants' generative AI products utilize a "large language model," or "LLM."
The different versions of GPT are examples of LLMs. An LLM, including those that power
ChatGPT beginning, take text prompts as inputs and emit outputs to predict responses that are
likely to follow a given the potentially billions of input examples used to train it.

32.     LLMs arrive at their outputs as the result of their training on works written by
humans, which are often protected by copyright.  They collect these examples in training sets.

33.     When assembling training sets, LLM creators, including Defendants, first identify
the works they want to include.  They then encode the work in computer memory as numbers
called "parameters."

28.34.  Defendants have not published the contents of the training sets used to train any
version of ChatGPT, but have disclosed information about those training sets prior to GPT-4.[1]
Beginning with GPT-4., Defendants have been fully secret about the training sets used to train that
and later versions of ChatGPT.  Plaintiffs' allegations about Defendants' training sets are therefore
based upon an extensive review of publicly available information regarding earlier versions of
ChatGPT and consultations with a data scientist employed by Plaintiffs' counsel to analyze that
information and provide insights into the manner in which AI is developed and functions.

35.     Plaintiffs' allegations about Defendants' training sets are also based upon
information learned through discovery in this case.

---

[1] Plaintiffs collectively refer to all versions of ChatGPT as "ChatGPT" unless a specific version is
specified.

29.36.  Earlier versions of ChatGPT[2] (prior to GPT-4) were trained using at least the following training sets: WebText, WebText2, and ~~sets derived from~~ Common Crawl. ~~These training sets range from collections of links posted on the website Reddit to a scrape of most of the internet.~~

37.    WebText and WebText2 were created by ~~the OpenAI~~ Defendants.  ~~Common Crawl originated elsewhere, but was adapted and utilized by~~ They are collections of all outbound links on the website Reddit that received at least three "karma."[3]  On Reddit, a karma indicates that users have generally approved the link.  The difference between the datasets is that WebText2 involved scraping links from Reddit over a longer period of time.  Thus, WebText2 is an expanded version of WebText.

30.38.  Defendants ~~for inclusion in ChatGPT training sets.  Upon information and belief, the OpenAI Defendants have created their own Common Crawl datasets, as opposed to copying a dataset already created by someone else.~~ have published a list of the top 1,000 web domains present in the WebText training set and their frequency.  According to that list, WebText included 33,598 distinct URLs from Raw Story's web domain and 23,183 distinct URLs from AlterNet's web domain.[4]

31.    ~~Plaintiffs' copyrighted works of journalism are published on the internet, and are conveyed to the public with author, title, and copyright information.~~

---

[2] ~~Plaintiffs collectively refer to all versions of ChatGPT as "ChatGPT" unless a specific version is specified.~~

[3] Alec Radford et al, Language Models are Unsupervised Multitask Learners, 3, https://cdn.openai.com/better-language-models/language_models_are_unsupervised_multitask_learners.pdf

[4] https://github.com/openai/gpt-2/blob/master/domains.txt.

32.     Plaintiffs' copyright-protected works are the result of significant investments by Plaintiffs in the human and other resources necessary to report on the news.

39.     Defendants have a record of, and are aware of, each URL that was included in each of their training sets.

40.     Joshua C. Peterson, currently an assistant professor in the Faculty of Computing and Data Sciences at Boston University, and two computational cognitive scientists with PhDs from U.C. Berkeley, created an approximation of the WebText dataset, called OpenWebText, by also scraping outbound links from Reddit that received at least three "karma," just like Defendants did in creating WebText.[5]   They published the results online.   A data scientist employed by Plaintiffs' counsel then analyzed those results.  OpenWebText contains 40,403 distinct URLs from rawstory.com and 34,003 from alternet.org.   A list of the Raw Story works contained in OpenWebText is attached as Exhibit 3.  A list of the AlterNet works contained in OpenWebText is attached as Exhibit 4.

41.     Upon information and belief, there are different numbers of Plaintiffs' articles in WebText and OpenWebText at least in part because the scrapes occurred on different dates.

42.     Defendants have explained that, in developing WebText, they used sets of algorithms called Dragnet and Newspaper to extract text from websites.[6]  Upon information and belief, Defendants used these two extraction methods, rather than one method, to create redundancies in case one method experienced a bug or did not work properly in a given case.

---

[5] https://github.com/jcpeterson/openwebtext/blob/master/README.md.
[6] Alec Radford et al., Language Models are Unsupervised Multitask Learners, 3 https://cdn.openai.com/better-language-models/language_models_are_unsupervised_multitask_learners.pdf.

Applying two methods rather than one would lead to a training set that is more consistent in the kind of content it contains, which is desirable from a training perspective.

43.     Dragnet's algorithms are designed to "separate the main article content" from other parts of the website, including "footers" and "copyright notices," and allow the extractor to make further copies only of the "main article content."[7]

44.     Like Dragnet, the Newspaper algorithms are incapable of extracting copyright notices and footers.  Further, a user of Newspaper has the choice to extract or not extract author and title information.  On information and belief, Defendants chose not to extract author and title information because they desired consistency with the Dragnet extractions, and Dragnet is designed not to extract author and title information.

45.     In applying the Dragnet and Newspaper algorithms while assembling the WebText dataset, Defendants removed Plaintiffs' author, title, and copyright notice information.

46.     Upon information and belief, Defendants, when using Dragnet and Newspaper, first download and save the relevant webpage before extracting data from it.  This is at least because, when they use Dragnet and Newspaper, they likely anticipate a possible future need to regenerate the dataset (*e.g.*, if the dataset becomes corrupted), and it is cheaper to save a copy than it is to recrawl all the data.

47.     Because, by the time of its scraping, Dragnet and Newspaper were publicly known to remove author, title, copyright notices, and footers, and given that OpenAI employs highly skilled data scientists who would know how Dragnet and Newspaper work, Defendants

---

[7] Matt McDonnell, Benchmarking Python Content Extraction Algorithms (Jan. 29, 2015), https://moz.com/devblog/benchmarking-python-content-extraction-algorithms-dragnet-readability-goose-and-eatiht.

intentionally and knowingly removed this copyright management information while assembling WebText.

48.     A data scientist employed by Plaintiffs' counsel applied the Dragnet code to Raw Story and AlterNet URLs. As a representative sample, three results from Raw Story and three results from Alternet are attached as Exhibit 5.  Of the examples Plaintiffs have examined, the resulting copies' text is in some cases completely identical to the original and in other substantively identical to the original (e.g., completely identical except for the seemingly random addition of an extra space between two words, the omission of a description or credit associated with an embedded photo, or the alteration of some formatting).  Of the examples Plaintiffs have examined, every copy lacks the copyright notice information with which it was originally conveyed, while most copies lack author and title.

49.     A data scientist employed by Plaintiffs' counsel also applied the Newspaper code to Raw Story and AlterNet URLs contained in OpenWebText. The data scientist applied the version of the code that enables the user not to extract author and title information based on the reasonable assumption that Defendants desired consistency with the Dragnet extractions. As a representative sample, three results for Raw Story and three results for AlterNet are attached as Exhibit 6.  Of the examples Plaintiffs have examined, the resulting copies' text is in some cases completely identical to the original and in others substantively identical to the original in the same sense as the Dragnet extractions (except that Newspaper does not randomly add spaces), while in one case a bulleted list was removed.  Of the examples Plaintiffs have examined, every copy lacks the author, title, and copyright notice information with which it was conveyed to the public.

50. Plaintiffs' data scientist did not alter the article in any way other than by applying the Dragnet or Newspaper algorithm. Thus, both the removal of CMI and any trivial alterations to the article occurred simultaneously by applying the Dragnet or Newspaper algorithm to an identical copy of Plaintiffs' work.

51. The absence of author, title, and copyright notice information from the copies of Plaintiffs' articles generated by applying the Dragnet and Newspaper codes—codes OpenAI has admitted to have intentionally used when assembling WebText—further corroborates that Defendants intentionally removed author, title, and copyright notice information from Plaintiffs' copyright-protected news articles.

52. Upon information and belief, Defendants have continued to use the same or similar Dragnet and Newspaper text extraction methods when creating training sets for every version of ChatGPT since GPT-2. This is at least because Defendants have admitted to using these methods for GPT-2 and have neither publicly disclaimed their use for later version of ChatGPT nor publicly claimed to have used any other text extraction methods for those later versions.

53. Common Crawl is a data set that consists of a scrape of most of the internet created by a non-profit research institute, also called Common Crawl. ChatGPT was trained on a version of Common Crawl, in addition to the WebText and WebText2 training sets.

54. To train GPT-2, OpenAI downloaded Common Crawl data from the third party's website and filtered it to include only certain works, such as those written in English.[8] When the third party downloads the article into Common Crawl, author, title, and copyright notice information is preserved.

---

[8] Tom B. Brown et al, Language Models are Few-Shot Learners, 14 (July 22, 2020), https://arxiv.org/pdf/2005.14165.

55.     Google has published instructions on how to replicate a dataset called C4, a monthly snapshot of filtered Common Crawl data that Google used to train its own AI models. Upon information and belief, based on the similarity of Defendants' and Google's goals in training AI models, C4 is substantially similar to the filtered versions of Common Crawl used to train ChatGPT.  The Allen Institute for AI, a nonprofit research institute launched by Microsoft cofounder Paul Allen, followed Google's instructions and published its recreation of C4 online.[9]

56.     A data scientist employed by Plaintiffs' counsel analyzed this recreation.  It contains 8,974 distinct URLs from rawstory.com.  The vast majority of these URLs contain Plaintiffs' copyright-protected news articles.  None of the news articles contains copyright notice information.  Most lack both author and title information.  In some cases, the articles' text is completely identical to the original.  In other cases, the articles' text is substantively identical to the original in the same sense as the Dragnet extractions (except that the C4 algorithm does not randomly add spaces), while in still others a small number of paragraphs are omitted.

57.     Upon information and belief, both the removal of CMI and any trivial alterations to the article occurred simultaneously by applying the C4 algorithm to an identical copy of Plaintiffs' work.

58.     As a representative sample, the text of three Raw Story articles as they appear in the C4 set is attached as Exhibit 7.   None of these articles contains the author, title, or copyright notice information with which it was conveyed to the public.

59.     In discovery, Defendants produced documents showing that Raw Story and AlterNet articles were included in Defendants' training sets.  Tables listing each article's URL and

---

[9] https://huggingface.co/datasets/allenai/c4.

the number of total occurrences across the training sets are attached as Exhibit 8 and Exhibit 9 for each article that Plaintiffs own.

60.     Plaintiffs have examined a sample of the copies as they appear in the training sets. None of the copies in the examined sample contains the author, title, or copyright notice with which the original was conveyed.  Apart from the removal of author, title, and copyright notice information, and the inclusion of certain symbols for formatting purposes (for example, the use of "/n/n" to denote a new paragraph), the text of the training set copies is identical to that of the originals in the sample examined by Plaintiffs.

61.     Plaintiffs have not licensed or otherwise permitted Defendants to include any of their works in their training sets.

62.     Defendants' actions in downloading thousands of Plaintiffs' articles without permission infringes Plaintiffs' copyright, more specifically, the right to control reproductions of copyright-protected works.

## DEFENDANTS' REGURGITATION, MIMICKING, AND ABRIDGEMENT OF COPYRIGHT-PROTECTED WORKS OF JOURNALISM

~~33.~~63.  ChatGPT offers a product to its customers that provides responses to questions or other prompts. ChatGPT's ability to provide these responses is the key value proposition of its product, one which it is able to sell to its customers for enormous sums of money, soon likely to be in the billions of dollars.

64.      To train ChatGPT, Defendants retain users' chat histories with ChatGPT unless the user takes the affirmative step of disabling that feature.[10]  Thus, upon information and belief, Defendants possess a repository of every regurgitation or abridgement of Plaintiffs' works apart from those whose storage users have affirmatively disabled.

~~34.~~65.  At least some of the time, ChatGPT provides or has provided responses to users that regurgitate verbatim or nearly verbatim copyright-protected works of journalism without providing any author, title, or copyright ~~information contained in those works~~notice information conveyed in connection with those works.  Examples of such regurgitations are included in Exhibit J to the Complaint in *Daily News, LP v. Microsoft Corporation*, No. 24-cv-03285 (S.D.N.Y. Apr. 30, 2024), ECF No. 1.

~~35.~~66.  At least some of the time, ChatGPT provides or has provided responses to users that mimic significant amounts of material from copyright-protected works of journalism without providing any author, title, or copyright notice information contained in those works.  For example, if a user asks ChatGPT about a current event or the results of a work of investigative journalism, ChatGPT will provide responses that mimic copyright-protected works of journalism that covered those events, not responses that are based on any journalism efforts by Defendants.

---

[10] New ways to manage your data in ChatGPT (Apr. 25, 2023), https://openai.com/index/new-ways-to-manage-your-data-in-chatgpt/.

67.    At least some of the time, ChatGPT memorizes and regurgitates material.[11] Defendants have publicly admitted their knowledge of this fact.  Defendants have also effectively admitted that regurgitation of copyrighted works is infringement: when Plaintiffs attempted to obtain the same regurgitations set forth in the *Daily News* case using the same methodology, Plaintiffs received in one instance a message stating, "I'm sorry, but I can't generate the original ending for the article or any copyrighted content."  Thus, upon information and belief, Defendants have recently changed ChatGPT to reduce regurgitations for copyright reasons.

68.    At least some of the time, ChatGPT provides or has provided responses to users that abridge copyright-protected works of journalism without providing any author, title, or copyright notice information conveyed in connection with those works.  Examples of such abridgements are included in Exhibit 11 to the First Amended Complaint in *The Center for Investigative Reporting, Inc. v. OpenAI, Inc.*, No. 24-cv-4872 (S.D.N.Y. Sept. 9, 2024), ECF No. 88-14.  For instance, in the fourth example, the ChatGPT abridgement reproduces, verbatim, nine consecutive paragraphs of text (minus one sentence) from the original article, which can be found at        https://www.motherjones.com/politics/2024/01/100-bill-crime-corruption-treasury-tax-evasion/.

69.    When earlier versions of ChatGPT (up to and including ChatGPT 3.5-turbo) abridge a copyright-protected news article in response to a user prompt, they draw from their training on the article.  During training, the patterns of all content, including copyright-protected news articles, are imprinted onto the model.  That imprint allows the model to abridge the article.

70.    When later versions of ChatGPT abridge a copyright-protected news article in response to a user prompt, they find the previously downloaded article inside a database called a

---

[11] OpenAI and journalism (Jan. 8, 2024), https://openai.com/index/openai-and-journalism/.

search index using a method called synthetic searching or retrieval-augmented generation ("RAG"). Upon information and belief, they make another copy of the article in the memory of their computing system and use their LLM or other programming to generate an abridgement by applying the model or other programming to the text of the article.

71.     Plaintiffs' articles are not merely collections of facts. Rather, they reflect the originality of their authors in selecting, arranging, and presenting facts to tell compelling stories. They also reflect the authors' analysis and interpretation of events, structuring of materials, marshaling of facts, and the emphasis given to certain aspects.

72.     An ordinary observer of a ChatGPT abridgement of copyright-protected news articles would conclude that the abridgements were derived from the articles being abridged.

73.     In response to prompts seeking an abridgement of an article, ChatGPT will typically provide a general abridgement of such an article, on the order of a few paragraphs. In some instances, the initial response will summarize the article in substantial detail. Further, when prompted by the user to provide more information about one or more aspects of that abridgement, ChatGPT will provide additional details, often in the format of a bulleted list of main points. If prompted by the user to provide more information on one of more of those points, ChatGPT will provide additional details. In some instances, however, ChatGPT will provide a bulleted list of main points in response to an initial prompt seeking an abridgement.

74.     A ChatGPT user is capable of obtaining a substantial abridgement of a copyright protected news article through such series of prompts, and in some instances, further prompts designed to elicit further summary are even suggested by ChatGPT itself. *See* Exhibit 11 to the First Amended Complaint in *The Center for Investigative Reporting, Inc. v. OpenAI, Inc.*, No. 24-cv-4872 (S.D.N.Y. Sept. 9, 2024), ECF No. 88-14. These abridgements lack copyright notice

information conveyed in connection with the work, and sometimes lack author information.  They sometimes link to webpages that do not belong to the news organization that owns the article and that do not contain the news organization's copyright management information.

75.    Thus, upon information and belief, abridgements from earlier versions of ChatGPT lack copyright notice and typically author information because Defendants intentionally removed that information from the ChatGPT training sets.

76.    Further, the abridgements from later versions of ChatGPT lack copyright notice and typically author information.  Upon information and belief, this is because Defendants intentionally removed them either when initially storing them in computer memory or when generating results by employing RAG.

77.    On April 22, 2024, Plaintiffs served a Request for Production on Defendants seeking all chat responses that included any portion of any articles published on rawstory.com or alternet.org.  That same day, Plaintiffs also served a Request for Production on Defendants seeking all chat responses that regurgitated any articles from rawstory.com or alternet.org.

78.    Defendants agreed to produce this information many months ago, but despite Plaintiffs' diligent follow-ups, they have not yet done so.  Analysis of this information would show the extent to which Defendants provided regurgitations or other outputs that sufficiently disseminated Plaintiffs' works or abridgement of those works.

**DEFENDANTS' INTENTIONAL REMOVAL OF COPYRIGHT MANAGEMENT INFORMATION FROM PLAINTIFFS' WORKS IN THEIR TRAINING SETS**

36.79.  ChatGPT does not have any independent knowledge of the information provided in its responses. Rather, to service Defendants' paying customers, ChatGPT instead repackages, among other material, the copyrighted journalism work product developed by Plaintiffs and others at their expense.

37.   ~~Various sources have recreated approximations of the Common Crawl and WebText training sets based on publicly available information discussing the methodologies used to create them. Those sources have made these recreated data sets, or instructions on how to derive them, available on the internet.  Thousands of Plaintiffs' works are contained in the recreated versions of these data sets without the author, title, and copyright information found in Plaintiffs' original publications.~~

~~38.~~1.   ~~If ChatGPT was trained on works of journalism that included the original author, title, and copyright information, ChatGPT would have learned to communicate that information when providing responses to users unless Defendants trained it otherwise.~~

~~39.   When ChatGPT provides responses to users, it generally does not provide the author, title, and copyright information applicable to the works on which its responses are based. Upon information and belief, in the instances in which author or title information is included in a response, it is because other material used in a training set references the author or title in the text of such material (e.g., a Wikipedia article discussing the underlying works of journalism).~~

~~40.~~80.  When providing responses, ChatGPT gives the impression that it is an all-knowing, "intelligent" source of the information being provided, when in reality, the responses are frequently based on copyrighted works of journalism that ChatGPT simply mimics.

81.   If ChatGPT was trained on works of journalism that included the original author, title, and copyright information, ChatGPT would have learned to communicate that information when providing responses to users unless Defendants trained it otherwise.

~~41.~~82. Based on the publicly available information described above, thousands of Plaintiffs' copyrighted works were included in Defendants' training sets without the author, title, and copyright notice information that Plaintiffs conveyed in publishing them.

- 19 -

42.83.   Based on the publicly available information described above, ~~the OpenAI~~including

Defendants' admission to using the Dragnet and Newspaper extraction methods, which remove

author, title, and copyright notice information from copyright-protected news articles published

online, Defendants intentionally removed author, title, and copyright notice information from

Plaintiffs' copyrighted works in creating ChatGPT training sets.

### DEFENDANTS' ACTUAL AND CONSTRUCTIVE KNOWLEDGE OF THEIR VIOLATIONS

84.    Defendants have acknowledged that use of copyright-protected works to train

ChatGPT requires a license to that content. and, in some instances. Recognizing that obligation,

Defendants have entered into agreements with large copyright owners such as Associated Press,

the Atlantic, Axel Springer, Dotdash Meredith, Financial Times, News Corp, and Vox Media to

obtain licenses to include those entities' copyright-protected works in Defendants' LLM training

data.

85.    Defendants are also in licensing talks with other copyright owners in the news

industry, but have offered no compensation to Plaintiffs.

86.    In a May 29, 2024 interview, OpenAI's Chief of Intellectual Property and Content,

Tom Rubin, stated that these deals focus on "the display of news content and use of the tools and

tech," and are thus "largely not" about training.[12]  This admission, while qualified, confirms that

these deals involve training, at least in part.

87.    Defendants created tools in late 2023 to allow copyright owners to block their work

from being incorporated into training sets.  This further corroborates that Defendants had reason

---

[12] Charlotte Tobitt, OpenAI content boss: 'Incumbent' on us to help small publishers, not just the giants, *PressGazette* (May 30, 2024), https://pressgazette.co.uk/platforms/openai-tom-rubin-publishers-news/.

to know that use of copyrighted material in their training sets without permission or license is copyright infringement.

88.     The creation of such tools also corroborates that Defendants had reason to know that their copyright infringement is enabled, facilitated, and concealed by their removal of author, title, and copyright notice information from their training sets.

43.89.  Defendants had reasonable grounds to know that the removal of author, title, and copyright notice information from copyright-protected works and their use in training ChatGPT would result in ChatGPT providing responses to ChatGPT users that incorporated or regurgitated material verbatim from copyrighted works in creating responses to users, without revealing that those works were subject to Plaintiffs' copyrights.  This is at least because Defendants were aware that ChatGPT responses are the product of its training sets and that ChatGPT would not know any author, title, and copyright information that was not included in training sets.

90.     Upon information and belief, Defendants had reason to know that the removal of author, title, and copyright notice information from copyright-protected works used in synthetic searching would result in ChatGPT providing responses to ChatGPT users that abridged or regurgitated material verbatim from copyrighted works in creating responses to users, without revealing that those works were subject to Plaintiffs' copyrights. This is at least because Defendants were aware that later versions of ChatGPT's responses to prompts are the product of the articles encoded in their computer memory, from which, upon information and belief, Defendants removed author, title, and copyright notice information.

44.91.  Defendants had reason to know that users of ChatGPT would further distribute the results of ChatGPT responses.  This is at least because Defendants promote ChatGPT as a tool that can be used by a user to generate content for a further audience.

45.92.  Defendants had reason to know that users of ChatGPT would be less likely to distribute ChatGPT responses if they were made aware of the author, title, and copyright notice information applicable to the material used to generate those responses.  This is at least because Defendants were aware that at least some likely users of ChatGPT respect the copyrights of others or fear liability for copyright infringement.

46.93.  Defendants had reason to know that ChatGPT would be less popular and would generate less revenue if users believed that ChatGPT responses violated third-party copyrights or if users were otherwise concerned about further distributing ChatGPT responses.  This is at least because Defendants were aware that they derive revenue from user subscriptions, that at least some likely users of ChatGPT respect the copyrights of others or fear liability for copyright infringement, and that such users would not pay to use a product that might result in copyright liability or did not respect the copyrights of others.

94.  If a commercial user of ChatGPT is sued for copyright infringement, Defendants have committed to paying the user's costs in defending against the infringement claim, and to indemnifying the user for an adverse judgment or settlement. These commitments apply only if the user uses the product as advertised. In particular, OpenAI's "Copyright Shield" does not apply if the user "disabled, ignored, or did not use any relevant citation, filtering or safety features or restrictions provided by OpenAI."[13] Thus, Defendants know or have reason to know that ChatGPT users are capable of infringing and likely to infringe copyright even when used according to terms specified by Defendants.

95.  Defendants intend in part for ChatGPT to replicate how ordinary English speakers express themselves. When ordinary English speakers are not conveying copyright-protected

_____
[13] https://openai.com/policies/service-terms/.

- 22 -

works, they do not include copyright management information—especially copyright notices. Had ChatGPT been trained on Plaintiffs' and others' copyright-protected works that include this copyright management information, it would have falsely learned that ordinary English speakers convey copyright management information in situations when they do not. To avoid this result, Defendants had a choice between removing the copyright management information at the outset or retraining ChatGPT not to emit the copyright management information after it had incorrectly learned how English speakers normally express themselves. Upon information and belief, Defendants chose to remove the copyright management information at the outset, at least because doing so involves fewer computational resources and therefore is far less expensive than retraining. Thus, because Defendants infringed Plaintiffs' copyright by using Plaintiffs' articles to train ChatGPT, Defendants removed Plaintiffs' copyright management information from its copyright-protected articles knowing, or having reasonable grounds to know, that doing so would facilitate their own training-based infringing conduct.

96.     Defendants' unauthorized copying of Plaintiffs' works into Defendants' training sets and search indices is facilitated by the removal of author, title, and copyright notice information because copying less data requires fewer computational and storage resources.

**DEFENDANTS' CONTINUING VIOLATIONS**

97.     Upon information and belief, Defendants have continued to unlawfully copy, regurgitate, abridge, and remove author, title, and copyright notice information from Plaintiffs' copyright-protected works up to the present date, or at least until Plaintiffs implemented the exclusion protocols on October 27, 2023, that Defendants released in August 2023 allowing websites to opt out of OpenAI's web crawling.

98.    ChatGPT has emitted significant material from copyright-protected works of journalism that significantly postdate the WebText and WebText2 training sets.  Examples are contained in Exhibit 11 to the First Amended Complaint in *The Center for Investigative Reporting, Inc. v. OpenAI, Inc.*, No. 24-cv-4872 (S.D.N.Y. Sept. 9, 2024), ECF No. 88-14.  ChatGPT could not have produced this material without Defendants' copying the original articles and storing them in computer memory, including in training sets created by ChatGPT 3.5-turbo and earlier, and search indices for RAG purposes.

99.    In addition, each successive GPT model has had orders of magnitude more parameters than the last.  For instance, GPT-4 is reported to have 1.8 trillion parameters,[14] a tenfold increase from the 175 billion parameters used to train GPT-3.[15]  Because adding more parameters requires training on more data, it is unlikely that Defendants would have foregone including Plaintiffs' articles in their more recent training sets. Thus, upon information and belief, Defendants continue to include Plaintiffs' articles in their training sets up to the present date.

100.    Further, Defendants' adoption of a tool in August 2023 to allow website owners to block web crawling would have been unnecessary they were not continuing to copy content from the internet, including Plaintiffs' copyright-protected works, as they had done in the past.

101.    According to OpenAI's Chief of Intellectual Property and Content, each of OpenAI's models is "trained from scratch."[16]  Thus, when assembling new training sets, OpenAI recrawls the same articles it included in past training sets.

---

[14] Maximilian Schreiner, GPT-4 architecture, datasets, costs and more leaked, The Decoder (July 11, 2023), https://the-decoder.com/gpt-4-architecture-datasets-costs-and-more-leaked/.

[15] Tom B. Brown et al, Language Models are Few-Shot Learners, 5 (July 22, 2020), https://arxiv.org/pdf/2005.14165.

[16] Charlotte Tobitt, OpenAI content boss: 'Incumbent' on us to help small publishers, not just the giants, PressGazette (May 30, 2024), https://pressgazette.co.uk/platforms/openai-tom-rubin-publishers-news/.

102.    As alleged above, upon information and belief, Defendants have continued to use the same or similar Dragnet and Newspaper text extraction methods when creating training sets for every version of ChatGPT since GPT-2. Thus, upon information and belief, they have continued to remove author, title, and copyright notice information from Plaintiffs' copyright-protected articles up to the present, including but not limited to Plaintiffs' articles that are contained in Defendants' training sets created in the past three years.

## Count I – Violation of 17 U.S.C. § 1202(b)(1) by OpenAI Defendants

47.103.        The above paragraphs are incorporated by reference into this Count.

48.104.        Plaintiffs are the owners of copyrighted works of journalism that contain author, title, and copyright notice information.

49.105.        Upon information and belief, the OpenAI Defendants created copies of Plaintiffs' works of journalism with author information removed and included them in training sets used to train ChatGPT.

50.106.        Upon information and belief, the OpenAI Defendants created copies of Plaintiffs' works of journalism with title information removed and included them in training sets used to train ChatGPT.

51.107.        Upon information and belief, the OpenAI Defendants created copies of Plaintiffs' works of journalism with copyright notice information removed and included them in training sets used to train ChatGPT.

52.108.        The OpenAI Defendants had reason to know that inclusion in their training sets of Plaintiffs' works of journalism without author, title, and copyright notice information would induce ChatGPT to provide responses to users that incorporated material from Plaintiffs'

copyright-protected works, and abridged or regurgitated copyright-protected works verbatim or nearly verbatim.

53.109.         The OpenAI Defendants had reason to know that inclusion in their training sets of Plaintiffs' works of journalism without author, title, and copyright notice information would induce ChatGPT users to distribute or publish ChatGPT responses that utilized Plaintiffs' copyright-protected works of journalism that such users would not have distributed or published if they were aware of the author, title, and copyright notice information.

54.     The OpenAI Defendants had reason to know that inclusion in their training sets of Plaintiffs' works of journalism without author, title, and copyright information would enable copyright infringement by ChatGPT and ChatGPT users.

55.110.         The OpenAI Defendants had reason to know that inclusion in their training sets of Plaintiffs' works of journalism without author, title, and copyright notice information would facilitate enable copyright infringement by Defendants, ChatGPT and ChatGPT users.

111.     The OpenAI Defendants had reason to know that inclusion in their training sets of Plaintiffs' works of journalism without author, title, and copyright notice information would facilitate copyright infringement by Defendants, ChatGPT and ChatGPT users.

56.112.         Defendants had reason to know that inclusion in their training sets of Plaintiffs' works of journalism without author, title, and copyright notice information would conceal copyright infringement by Defendants, ChatGPT, and ChatGPT users.

57.     The OpenAI Defendants have acknowledged that use of copyright-protected works to train ChatGPT requires a license to that content and, in some instances, have entered licensing agreements with large copyright owners such as Associated Press and Axel Springer.  They are

- 26 -

~~also in licensing talks with other copyright owners in the news industry, but have offered no~~ ~~compensation to Plaintiffs.~~

~~58.    The OpenAI Defendants created tools in late 2023 to allow copyright owners to~~ ~~block their work from being incorporated into training sets.   This further corroborates that the~~ ~~OpenAI Defendants had reason to know that use of copyrighted material in their training sets is~~ ~~copyright infringement, which is enabled, facilitated, and concealed by the OpenAI Defendants'~~ ~~removal of author, title, copyright, and terms of use information from their training sets.~~

## PRAYER FOR RELIEF

Plaintiffs seek the following relief:

(i)     Either statutory damages or the total of Plaintiffs' damages and Defendants' profits, to be elected by Plaintiffs;

(ii)    An injunction requiring Defendants to remove all copies of Plaintiffs' copyrighted works from which author, title, <u>or</u> copyright<s>, and terms of use</s> <u>notice</u> information was removed from their training sets and any other repositories;

(iii)    <u>An injunction prohibiting the unlawful conduct alleged above;</u>

(iv)    <u>An injunction ordering the destruction of all GPT or other LLMs and training sets that incorporate Plaintiffs' works from which author, title, or copyright notice has been removed; and</u>

<s>(iii)</s><u>(v)</u> Attorney fees and costs.

## JURY DEMAND

<s>Plaintiff demands</s><u>Plaintiffs demand</u> a jury trial.

RESPECTFULLY SUBMITTED,

*/s/ Stephen Stich Match*

<s>Jonathan</s><u>Jon</u> Loevy<u>* (*pro hac vice*)</u>
Michael Kanovitz<u>* (*pro hac vice*)</u>
Lauren Carbajal<u>* (*pro hac vice*)</u>
Stephen Stich Match (No. 5567854)
Matthew Topic<u>* (*pro hac vice*)</u>
<u>Thomas Kayes (*pro hac vice*)</u>

- 27 -

Steven Art (*pro hac vice*)
Kyle Wallenberg (*pro hac vice*)

LOEVY & LOEVY
311 North Aberdeen, 3rd Floor
Chicago, IL 60607
312-243-5900
jon@loevy.com
mike@loevy.com
carbajal@loevy.com
match@loevy.com
matt@loevy.com

~~*pro hac vice forthcoming~~

~~February 28~~ kayes@loevy.com
steve@loevy.com
wallenberg@loevy.com

November 21, 2024

# Exhibit 5

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- X

RAW STORY MEDIA, INC., ALTERNET
MEDIA, INC.,

              Plaintiffs,

              v.

OPENAI, INC., OPENAI GP, LLC,
OPENAI, LLC, OPENAI OPCO LLC,
OPENAI GLOBAL LLC, OAI
CORPORATION, LLC, OPENAI
HOLDINGS, LLC,

              Defendants.

------------------------------------------------------- X

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

NO. 1:24-cv-01514 CM

## OPENAI DEFENDANTS' RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS

      Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure and the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York ("Local Rules"), Defendants OpenAI, Inc., OpenAI GP, LLC, OpenAI, LLC, OpenAI OpCo, LLC, OpenAI Global, LLC, OAI Corporation, LLC and OpenAI Holdings, LLC (collectively, "OpenAI") hereby object and respond to Plaintiffs' First Set of Requests for Production of Documents ("Requests"). To the extent that OpenAI agrees to produce documents in response to these Requests, each entity is agreeing to produce only its own documents, to the extent those documents can be located after a reasonable search. Furthermore, an agreement by OpenAI to search for documents does not mean that each entity has documents in its possession, custody, or control.

## **INTRODUCTORY RESPONSE**

OpenAI responds to the Requests on the basis of the best information available to it at the time the responsive information was gathered, within the limits of time, and subject to the objections described below.  OpenAI responds to the Requests as it interprets and understands each Request set forth herein.  If Plaintiffs subsequently assert an interpretation of any of the Requests that differs from OpenAI's understanding, OpenAI reserves the right to supplement its objections and/or responses.

OpenAI's willingness to respond to any particular Request does not constitute an admission that OpenAI agrees with any characterization, definition, or assumption contained in the Request or an assumption or an acknowledgement by OpenAI that the Request is proper, that the information sought is within the proper bounds of discovery or that demands for similar information will be treated in similar fashion.  Furthermore, a statement that responsive documents will be produced in response to a particular Request does not mean that OpenAI knows any such document exists or is in its possession, custody, or control.

OpenAI's responses to the Requests may contain, provide, or refer to information that will be subject to a protective order to be entered in this matter and should therefore be treated accordingly.

OpenAI has not yet completed its discovery relating to this case and its investigation of the facts is ongoing.  OpenAI anticipates that additional information responsive to the Requests may be obtained as discovery proceeds.  OpenAI's responses to the Requests are therefore made without prejudice to OpenAI's right to amend, correct or supplement its responses to the Requests.

## **GENERAL OBJECTIONS**

1.      OpenAI objects to the Requests to the extent that they:

      a.      call for the discovery of information protected by the attorney-client privilege, common-interest privilege, work-product protection, and/or any other applicable privilege or immunity under federal, state, or local law.  The inadvertent production of any information that is privileged or otherwise protected from discovery shall not constitute a waiver of any such privilege or protection;

      b.      are vague, ambiguous, overly broad, unduly burdensome, unreasonably cumulative, overlapping, or duplicative;

      c.      require disclosure of information that is neither relevant to the claims or defenses of any party in this action, nor proportional to the needs of the case;

      d.      purport to require the disclosure of information already in the possession of Plaintiffs, available from public sources, as accessible to Plaintiffs as to OpenAI, or obtainable from another source that is more convenient, less burdensome, or less expensive.  OpenAI provides these responses with the understanding that Plaintiffs already have access to such sources, including all materials on OpenAI's website;

      e.      attempt to impose burdens that exceed or are different from the requirements of the Federal Rules of Civil Procedure and/or the applicable Local Rules, and relevant case law.  OpenAI will comply with its obligations under the Federal and Local Rules, but will not comply with Instructions that are inconsistent with, or impose obligations beyond, applicable rules.  OpenAI stands ready to meet and confer to discuss the best and most efficient way to conduct discovery bilaterally;

f.      call for information concerning documents that are no longer in existence or reasonably accessible, or documents not in OpenAI's possession, custody, or control.  OpenAI will only provide relevant, non-privileged information that is within OpenAI's present possession, custody, or control and available after a reasonable investigation;

g.      imprecisely specify the information sought.  Where imprecise terms are used, OpenAI will, therefore, provide only information that is responsive to the Request based on OpenAI's interpretation of the Request;

h.      seek information concerning "all documents and things," or the like on the basis that providing a response to such Requests would be unduly burdensome;

i.      are not limited to a reasonable time period.  OpenAI will produce documents from a reasonable time period as it relates to the case;

j.      purport to impose a duty on OpenAI to undertake a search for information beyond a reasonable search of its files as it relates to this case and where information responsive to the Request would reasonably be expected to be stored in the ordinary course of business;

k.      seek discovery in violation of any applicable law;

l.      are premature and/or the disclosure of expert discovery, opinions or analysis;

m.      seek information that is the confidential and proprietary information of a third party, the joint confidential and proprietary information of OpenAI and a third party, or the subject of a non-disclosure/confidentiality agreement between OpenAI and a third party. OpenAI will produce third-party confidential documents as set forth herein, subject to the terms of the protective order to be entered by the Court; or seek information that is more efficiently or appropriately obtained through some other form of discovery.

2.      Where the Request includes words and concepts involving a legal conclusion, any response is not an admission that such legal conclusions apply.

3.      OpenAI reserves all objections to the competency, relevance, materiality, or admissibility at trial or any other proceeding of any information provided or document identified in response to the Requests.  The identification of any document or the provision of any information does not constitute an admission that such document or information exists or is relevant to the pending litigation.

4.      OpenAI objects to each Request to the extent that it seeks trade secrets or confidential or proprietary information of OpenAI.  OpenAI will produce confidential documents as set forth herein, subject to and after the entry of a protective order in this matter.

5.      OpenAI objects to the production of electronically stored information ("ESI") before an applicable ESI protocol has been entered.  OpenAI will produce electronically stored information as set forth herein, subject to the terms of an ESI protocol to be agreed upon by the parties.

6.      OpenAI objects to Requests to the extent they purport to require the OpenAI defendants to each produce their own copy of a responsive document as duplicative, unreasonably burdensome, and not proportional to the needs of this case.

Without waiving the foregoing General Objections but in express reliance thereon, OpenAI incorporates the foregoing objections into the responses below and responds to the individually numbered Requests as follows:

**REQUEST FOR PRODUCTION NO. 1:**

All documents referenced in your initial disclosures.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 1:

OpenAI objects that the term "referenced" is vague and ambiguous.

Subject to the foregoing general and specific objections, OpenAI states that it will produce the documents "referenced in its initial disclosures," if any, on which it intends to rely at summary judgment or trial, at the appropriate time.

## REQUEST FOR PRODUCTION NO. 2:

All documents on which you will rely in this case.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 2:

OpenAI objects to this request on the grounds that it is premature given that discovery is in its early stages and OpenAI has not yet begun preparation for summary judgment or trial.

Subject to the foregoing general and specific objections, OpenAI responds that it will produce non-privileged responsive documents on which it intends to rely at summary judgment or trial at the appropriate time.

## REQUEST FOR PRODUCTION NO. 3:

Documents sufficient to show the following for each of your AI training sets:

      a.     the date the training set was created

      b.     who created the training set

      c.     all versions of your products trained using the training set

      d.     each article (identified by URL) from www.rawstory.com or www.alternet.org that was included in whole or in part in the training set

      e.     the extent to which the articles in the training set included author information

      f.     the extent to which the articles in the training set included title information

g.    the extent to which the articles in the training set included copyright notice information

h.    the extent to which the articles in the training set included terms of use information

i.    every person or entity to whom access to the training set was provided.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 3:

OpenAI objects to this request as overbroad, unduly burdensome, and disproportionate to the needs of the case.  OpenAI also objects to this request as seeking information not in OpenAI's possession, custody, or control insofar as it seeks documents sufficient to show "every person to whom access to the training set was provided."  OpenAI further objects to this request as overbroad insofar as Plaintiffs define "the articles in the training set" as articles other than those from www.rawstory.com or www.alternet.org.  OpenAI accordingly interprets the phrase "the articles in the training set" to mean only those articles, if any, from www.rawstory.com or www.alternet.org.

Subject to the foregoing general and specific objections, OpenAI will make available for inspection, pursuant to an agreed-upon training protocol to be negotiated between the parties, the training data for models used for ChatGPT.

## REQUEST FOR PRODUCTION NO. 4:

The articles from www.rawstory.com and www.alternet.org that were included in any of your training sets, in the form in which you obtained those articles.

**<u>RESPONSE TO REQUEST FOR PRODUCTION NO. 4:</u>**

Subject to the foregoing general objections, OpenAI will make available for inspection, pursuant to an agreed-upon training protocol to be negotiated between the parties, the training data in its possession for models used for ChatGPT.

**<u>REQUEST FOR PRODUCTION NO. 5:</u>**

The articles from www.rawstory.com and www.alternet.org that were included in any of your training sets, in the form in which they appear in your training sets.

**<u>RESPONSE TO REQUEST FOR PRODUCTION NO. 5:</u>**

Subject to the foregoing general objections, OpenAI will make available for inspection, pursuant to an agreed-upon training protocol to be negotiated between the parties, the training data in its possession for models used for ChatGPT.

**<u>REQUEST FOR PRODUCTION NO. 6:</u>**

All documents concerning copyright in the context of AI, including without limitation actual or potential copyright infringement and actual or potential copyright licensing.

**<u>RESPONSE TO REQUEST FOR PRODUCTION NO. 6:</u>**

OpenAI objects to this request as overly broad, unduly burdensome, and disproportionate to the needs of the case.  OpenAI further objects to this interrogatory because it is not reasonably calculated to lead to the discovery of admissible evidence and as not relevant to any claim or defense in this litigation because Plaintiffs do not assert a copyright infringement claim.  OpenAI further objects to this request to the extent that it calls for the production of documents protected from disclosure by the attorney-client privilege, common-interest privilege, attorney work-product doctrine, or any other applicable privilege or protection.

Subject to the foregoing general and specific objections, OpenAI states that it is willing to meet and confer regarding an appropriately narrow scope for this request.

**REQUEST FOR PRODUCTION NO. 7:**

All documents concerning the Digital Millennium Copyright Act or DMCA.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 7:**

OpenAI objects to this request as overly broad, unduly burdensome, and disproportionate to the needs of the case.  OpenAI further objects to this request to the extent that it calls for the production of documents protected from disclosure by the attorney-client privilege, common-interest privilege, attorney work-product doctrine, or any other applicable privilege or protection.

Subject to the foregoing general and specific objections, OpenAI states that it is willing to meet and confer regarding an appropriately narrow scope for this request.

**REQUEST FOR PRODUCTION NO. 8:**

All documents concerning copyright management information or CMI.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 8:**

OpenAI objects to this request as overly broad, unduly burdensome, and disproportionate to the needs of the case.  OpenAI further objects to this request to the extent that it calls for the production of documents protected from disclosure by the attorney-client privilege, common-interest privilege, attorney work-product doctrine, or any other applicable privilege or protection.

Subject to the foregoing general and specific objections, OpenAI states that it is willing to meet and confer regarding an appropriately narrow scope for this request.

**REQUEST FOR PRODUCTION NO. 9:**

All copyright license agreements or other agreements in which you were granted a license or other permission to use or copy any copyright-protected works, and all documents created in the course of negotiating or discussing such agreements.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 9:**

OpenAI objects to this request as overbroad, unduly burdensome, and disproportionate to the needs of this case. OpenAI further objects to this request as seeking documents that are not relevant to any claim or defense in this litigation because Plaintiffs do not assert a copyright infringement claim. To the extent Plaintiffs seek "all documents created in the course of negotiating or discussing such agreements," OpenAI also objects to this request as seeking documents outside the custody and control of OpenAI. OpenAI further objects to this request to the extent that it calls for the production of documents protected from disclosure by the attorney-client privilege, common-interest privilege, attorney work-product doctrine, or any other applicable privilege or protection.

Subject to the foregoing general and specific objections, OpenAI responds that it will produce any responsive, non-privileged executed agreements relating to training data used to train models powering ChatGPT in its possession, custody, or control, if any, that it locates pursuant to a reasonable and diligent search, after the entry of a protective order.

**REQUEST FOR PRODUCTION NO. 10:**

All documents concerning what material and information within that material to include or omit in any training sets.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 10:**

OpenAI objects to this request as overbroad, unduly burdensome, and disproportionate to the needs of this case.  OpenAI further objects to this request to the extent that it calls for the production of documents protected from disclosure by the attorney-client privilege, common-interest privilege, attorney work-product doctrine, or any other applicable privilege or protection.  OpenAI also objects that the phrase "within that material" is vague and ambiguous.

Subject to the foregoing general and specific objections, OpenAI states that it is willing to meet and confer on an appropriately narrow scope for this request.

**REQUEST FOR PRODUCTION NO. 11:**

All documents concerning actual or potential regurgitation.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 11:**

OpenAI objects to this request as overly broad, unduly burdensome, and disproportionate to the needs of the case.  OpenAI further objects to this request to the extent that it calls for the production of documents protected from disclosure by the attorney-client privilege, common-interest privilege, attorney work-product doctrine, or any other applicable privilege or protection.  OpenAI also objects that the term "regurgitation" is vague and ambiguous.  OpenAI interprets the term "regurgitation" to mean when a model inadvertently memorizes training data and reproduces portions of the data in its outputs.

Subject to the foregoing general and specific objections, OpenAI responds that it is willing to meet and confer regarding an appropriately narrow scope for this request.

**REQUEST FOR PRODUCTION NO. 12:**

All documents concerning the decision to allow publishers to opt out of OpenAI's web crawling.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 12:**

OpenAI objects to this request as seeking documents that are not relevant to any claim or defense in this litigation.  OpenAI further objects to this request as overbroad, unduly burdensome, and not proportional to the needs of this case.  OpenAI also objects to this request to the extent that it calls for the production of documents protected from disclosure by the attorney-client privilege, common-interest privilege, attorney work-product doctrine, or any other applicable privilege or protection.  OpenAI further objects that the terms "publishers" and "opt out" are vague and ambiguous.  OpenAI interprets "opt out" to mean allowing individuals to elect not to have ChatGPT train its models on the individual's content.

Based on the foregoing general and specific objections, OpenAI states that it will not produce documents in response to this request.

**REQUEST FOR PRODUCTION NO. 13:**

All chat responses that included any portion of any articles published on www.rawstory.com and www.alternet.org.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 13:**

OpenAI objects to this request as overbroad, unduly burdensome, and disproportionate to the needs of the case.  OpenAI further objects to this request as seeking documents outside the possession, custody, and control of OpenAI.  OpenAI further objects that the term "portion" is vague and ambiguous.  OpenAI interprets the word "portion" to mean one or more sentences of any articles published on www.rawstory.com and www.alternet.org.

Subject to the foregoing general and specific objections, OpenAI states that it is willing to meet and confer regarding an appropriate manner to make ChatGPT outputs available for inspection.

**REQUEST FOR PRODUCTION NO. 14:**

All chat responses that regurgitated any articles from www.rawstory.com and www.alternet.org.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 14:**

OpenAI objects to this request as overbroad, unduly burdensome, and disproportionate to the needs of the case.  OpenAI further objects to this request as seeking documents outside the custody and control of OpenAI.  OpenAI also objects that the term "regurgitated" is vague and ambiguous.  OpenAI interprets the term "regurgitated" to mean when a model inadvertently memorizes training data and reproduces portions of the data in its outputs.

Subject to the foregoing general and specific objections, OpenAI states that it is willing to meet and confer regarding an appropriate manner to make ChatGPT outputs available for inspection.

**REQUEST FOR PRODUCTION NO. 15:**

Your organizational charts for all business units or employees involved in AI.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 15:**

OpenAI objects to this request as overly broad, unduly burdensome, and disproportionate to the needs of the case.  OpenAI further objects to this request on the ground that the phrase "involved with AI" is vague and ambiguous.

Subject to the foregoing general and specific objections, OpenAI states that information about its corporate structure is publicly available on its website, including at https://openai.com/blog and https://openai.com/our-structure.  To the extent Plaintiffs believe they are entitled to additional information, OpenAI states that it is willing to meet and confer regarding an appropriately narrow scope for this request.

**REQUEST FOR PRODUCTION NO. 16:**

Your job descriptions for each position involved in AI.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 16:**

OpenAI objects to this request as overly broad, unduly burdensome, and disproportionate to the needs of the case.  OpenAI further objects to this request on the ground that the phrase "involved with AI" is vague and ambiguous.

Subject to the foregoing general and specific objections, OpenAI states that it is willing to meet and confer on an appropriately narrow scope for this request.

**REQUEST FOR PRODUCTION NO. 17:**

All documents concerning the paper Scaling Laws for Neural Language Models.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 17:**

OpenAI objects to this request as overbroad and disproportionate to the needs of the case. OpenAI further objects to this request to the extent that it calls for the production of documents protected from disclosure by the attorney-client privilege, common-interest privilege, attorney work-product doctrine, or any other applicable privilege or protection.  OpenAI further objects to this request on the ground that it does not identify the information or documents sought with reasonable particularity and as not relevant to any claim or defense in this litigation.

Subject to the foregoing general and specific objections, OpenAI states that it is willing to meet and confer on an appropriately narrow scope for this request.

**REQUEST FOR PRODUCTION NO. 18:**

All documents containing the term "scale" in the context of AI training sets.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 18:**

OpenAI objects to this request as overly broad, unduly burdensome, and disproportionate to the needs of the case.  OpenAI also objects that the term "scale" is vague and ambiguous. OpenAI further objects to this request on the ground that it does not identify the information or documents sought with reasonable particularity and as not relevant to any claim or defense in this litigation because Plaintiffs do not assert a copyright infringement claim.  OpenAI also objects to this request to the extent that it calls for the production of documents protected from disclosure by the attorney-client privilege, common-interest privilege, attorney work-product doctrine, or any other applicable privilege or protection.

Subject to the foregoing general and specific objections, OpenAI states that it is willing to meet and confer on an appropriately narrow scope for this request.

**REQUEST FOR PRODUCTION NO. 19:**

All documents concerning any speeches given by Sam Altman or any other employees or agents of Defendants referencing AI training sets, including the need for large training sets.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 19:**

OpenAI objects to this request as overly broad, unduly burdensome, and disproportionate to the needs of the case.  OpenAI further objects to this request as not reasonably calculated to lead to the discovery of admissible evidence and as seeking documents that are not relevant to any claim or defense in this litigation because Plaintiffs do not assert a copyright infringement claim.  OpenAI also objects to this request as seeking information or documents outside of its possession, custody, or control, and information or documents that are equally available to Plaintiffs.  OpenAI further objects to this request to the extent that it calls for the production of

documents protected from disclosure by the attorney-client privilege, common-interest privilege, attorney work-product doctrine, or any other applicable privilege or protection.

Based on the foregoing general and specific objections, OpenAI states that it will not produce documents in response to this request.

**REQUEST FOR PRODUCTION NO. 20:**

All documents concerning the use of synthetic data in AI training sets.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 20:**

OpenAI objects to this request as overly broad, unduly burdensome, and disproportionate to the needs of the case.  OpenAI also objects that the term "synthetic data" is vague and ambiguous.  OpenAI further objects to this request as seeking documents that are not relevant to any claim or defense in this litigation because Plaintiffs do not assert a copyright infringement claim.  OpenAI also objects on the ground that this request does not identify the information or documents sought with reasonable particularity.  OpenAI further objects to this request as seeking information or documents outside of its possession, custody, or control.  OpenAI further objects to this request to the extent that it calls for the production of documents protected from disclosure by the attorney-client privilege, common-interest privilege, attorney work-product doctrine, or any other applicable privilege or protection.

Based on the foregoing general and specific objections, OpenAI states that it will not produce documents in response to this request.

**REQUEST FOR PRODUCTION NO. 21:**

All documents containing the term "whisper."

**RESPONSE TO REQUEST FOR PRODUCTION NO. 21:**

OpenAI objects to this request as overly broad, unduly burdensome, and disproportionate to the needs of the case.  OpenAI also objects that the term "whisper" is vague and ambiguous. To the extent Plaintiffs seek documents pertaining to OpenAI's speech recognition software, OpenAI objects to this request because such software is not encompassed in Plaintiffs' Complaint.  OpenAI further objects to this request as seeking documents not reasonably calculated to lead to the discovery of admissible evidence and that are not relevant to any claim or defense in this litigation.  OpenAI also objects to this request on the ground that it does not identify the information or documents sought with reasonable particularity.  OpenAI further objects to this request to the extent that it calls for the production of documents protected from disclosure by the attorney-client privilege, common-interest privilege, attorney work-product doctrine, or any other applicable privilege or protection.

Based on the foregoing general and specific objections, OpenAI states that it will not produce documents in response to this request.

**REQUEST FOR PRODUCTION NO. 22:**

All documents concerning the synthetic event data horizon.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 22:**

OpenAI objects to this request as overly broad, unduly burdensome, and disproportionate to the needs of the case.  OpenAI also objects that the term "synthetic event data horizon" is vague and ambiguous and, to the extent OpenAI understands the term, it is not encompassed by Plaintiffs' Complaint.  OpenAI further objects to this request as seeking documents not reasonably calculated to lead to the discovery of admissible evidence and that are not relevant to any claim or defense in this litigation.  OpenAI further objects to this request on the ground that

it does not identify the information or documents sought with reasonable particularity.  OpenAI further objects to this request to the extent that it calls for the production of documents protected from disclosure by the attorney-client privilege, common-interest privilege, attorney work-product doctrine, or any other applicable privilege or protection.

Based on the foregoing general and specific objections, OpenAI states that it will not produce documents in response to this request.

**REQUEST FOR PRODUCTION NO. 23:**

All documents concerning the Authors Guild v. Google copyright decision.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 23:**

OpenAI objects to this request as overly broad, unduly burdensome, and disproportionate to the needs of the case.  OpenAI further objects to this request as seeking documents that are not relevant to any claim or defense in this litigation because Plaintiffs do not assert a copyright infringement claim, and as seeking documents outside the possession, custody, and control of OpenAI.  OpenAI further objects to this request to the extent that it calls for the production of documents protected from disclosure by the attorney-client privilege, common-interest privilege, attorney work-product doctrine, or any other applicable privilege or protection.

Based on the foregoing general and specific objections, OpenAI states that it will not produce documents in response to this request.

**REQUEST FOR PRODUCTION NO. 24:**

All documents concerning your public relations strategies regarding AI copyright issues, including without limitation the decision to refer to materials in your training sets as "publicly available" and any lawsuits against you.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 24:**

OpenAI objects to this request as overly broad, unduly burdensome, and disproportionate to the needs of the case.  OpenAI further objects to this request as seeking documents that are not relevant to any claim or defense in this litigation because Plaintiffs do not assert a copyright infringement claim.  OpenAI further objects to this request to the extent that it calls for the production of documents protected from disclosure by the attorney-client privilege, common-interest privilege, attorney work-product doctrine, or any other applicable privilege or protection.  OpenAI further objects to this request to the extent it seeks information and documents that are publicly available and thus equally accessible to Plaintiffs.

Based on the foregoing general and specific objections, OpenAI states that it will not produce documents in response to this request.

**REQUEST FOR PRODUCTION NO. 25:**

All communications with your lobbyists or government relations advisors or representatives regarding copyright or any copyright lawsuits.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 25:**

OpenAI objects to this request as overly broad, unduly burdensome, and disproportionate to the needs of the case.  OpenAI further objects to this request as seeking documents that are not relevant to any claim or defense in this litigation.  OpenAI further objects to this request to the extent that it calls for the production of documents protected from disclosure by the attorney-client privilege, common-interest privilege, attorney work-product doctrine, or any other applicable privilege or protection.

Based on the foregoing general and specific objections, OpenAI states that it will not produce documents in response to this request.

**REQUEST FOR PRODUCTION NO. 26:**

All documents you produced in any other lawsuit alleging in whole or in part copyright infringement or violations of the DMCA.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 26:**

OpenAI objects to this request as overly broad, unduly burdensome, and disproportionate to the needs of the case. OpenAI also objects to this request as an improper request for "cloned" discovery. OpenAI further objects to this request as seeking documents that are not relevant to any claim or defense in this litigation and as not reasonably calculated to lead to the discovery of admissible evidence to the extent it seeks information provided in a lawsuit alleging "in whole or in part copyright infringement" because Plaintiffs do not assert a copyright infringement claim. OpenAI further objects to this request as seeking documents that are not relevant to any claim or defense in this litigation to the extent it seeks information relevant only to plaintiffs in other actions, if any, against OpenAI.

Based on the foregoing general and specific objections, OpenAI states that it will not produce documents in response to this request.

**REQUEST FOR PRODUCTION NO. 27:**

All interrogatory responses you provided in any other lawsuit alleging in whole or in part copyright infringement or violations of the DMCA.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 27:**

OpenAI objects to this request as overly broad, unduly burdensome, and disproportionate to the needs of the case. OpenAI also objects to this request as an improper request for "cloned" discovery and as seeking to circumvent the limitations on interrogatories as set out in Federal Rule of Civil Procedure 33 and Local Rule 33.3. OpenAI further objects to this request as

seeking documents that are not relevant to any claim or defense in this litigation and as not reasonably calculated to lead to the discovery of admissible evidence to the extent it seeks information provided in a lawsuit alleging "in whole or in part copyright infringement" because Plaintiffs do not assert a copyright infringement claim.  OpenAI further objects to this request as seeking documents that are not relevant to any claim or defense in this litigation to the extent it seeks information relevant only to plaintiffs in other actions, if any, against OpenAI.

Based on the foregoing general and specific objections, OpenAI states that it will not produce documents in response to this request.

**REQUEST FOR PRODUCTION NO. 28:**

All RFA responses you provided in any other lawsuit alleging in whole or in part copyright infringement or violations of the DMCA.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 28:**

OpenAI objects to this request as overly broad, unduly burdensome, and disproportionate to the needs of the case.  OpenAI also objects to this request as an improper request for "cloned" discovery.  OpenAI further objects to this request as seeking documents that are not relevant to any claim or defense in this litigation and as not reasonably calculated to lead to the discovery of admissible evidence to the extent it seeks information provided in a lawsuit alleging "in whole or in part copyright infringement" because Plaintiffs do not assert a copyright infringement claim. OpenAI further objects to this request as seeking documents that are not relevant to any claim or defense in this litigation to the extent it seeks information relevant only to plaintiffs in other actions, if any, against OpenAI.

Based on the foregoing general and specific objections, OpenAI states that it will not produce documents in response to this request.

**REQUEST FOR PRODUCTION NO. 29:**

All communications with any government bodies concerning your AI products, copyright, or the DMCA, and any documents concerning those communications.  This includes communications made or received by any lawyers, lobbyists, government relations advisors, or other agents working on your behalf.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 29:**

OpenAI objects to this request as overly broad, unduly burdensome, and disproportionate to the needs of the case.  OpenAI further objects to this request as seeking documents that are not relevant to any claim or defense in this litigation and as not reasonably calculated to lead to the discovery of admissible evidence.  OpenAI further objects to this request to the extent that it calls for the production of documents protected from disclosure by the attorney-client privilege, common-interest privilege, attorney work-product doctrine, or any other applicable privilege or protection.  OpenAI also objects to this request as seeking information or documents outside of its possession, custody, or control, and as seeking improper "cloned" discovery.

Based on the foregoing general and specific objections, OpenAI states that it will not produce documents in response to this request.

**REQUEST FOR PRODUCTION NO. 30:**

All communications between you and any insurer or insurance broker regarding this case or any other copyright infringement or DMCA claims brought against you.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 30:**

OpenAI objects to this request as overly broad, unduly burdensome, and disproportionate to the needs of the case.  OpenAI further objects to this request as seeking documents that are not relevant to any claim or defense in this litigation and as not reasonably calculated to lead to the

discovery of admissible evidence.  OpenAI further objects to this request to the extent that it calls for the production of documents protected from disclosure by the attorney-client privilege, common-interest privilege, attorney work-product doctrine, or any other applicable privilege or protection.

Based on the foregoing general and specific objections, OpenAI states that it will not produce documents in response to this request.

Dated: May 22, 2024

MORRISON & FOERSTER LLP

By: */s/ Allyson R. Bennett*
    Joseph C. Gratz (*pro hac vice*)
    JGratz@mofo.com
    Vera Ranieri (*pro hac vice*)
    VRanieri@mofo.com
    425 Market Street
    San Francisco, CA  94105-2482
    Telephone:  415.268.7000
    Facsimile:  415.268.7522

    Allyson R. Bennett (*pro hac vice*)
    abennett@mofo.com
    Rose S. Lee (*pro hac vice*)
    roselee@mofo.com
    707 Wilshire Boulevard, Suite 6000
    Los Angeles, CA  90017-3543
    Telephone:  213.892.5200
    Facsimile:  213.892.5454

    Attorneys for Defendants
    OPENAI, INC., OPENAI GP, LLC,
    OPENAI, LLC, OPENAI OPCO LLC,
    OPENAI GLOBAL LLC, OAI
    CORPORATION, LLC, and OPENAI
    HOLDINGS, LLC

LATHAM & WATKINS LLP


By: _/s/ Joseph R. Wetzel_____
    Joseph R. Wetzel
    joseph.wetzel@lw.com
    Andrew M. Gass (*pro hac vice*)
    andrew.gass@lw.com
    505 Montgomery Street, Suite 2000
    San Francisco, CA 94111
    Telephone: 415.391.0600

    Sarang V. Damle
    sy.damle@lw.com
    555 Eleventh Street, NW, Suite 1000
    Washington, D.C. 20004
    Telephone: 202.637.2200

    Allison L. Stillman
    alli.stillman@lw.com
    Luke A. Budiardjo
    luke.budiardjo@lw.com
    Yijun Zhong
    elaine.zhong@lw.com
    1271 Avenue of the Americas
    New York, NY 10020
    Telephone: 212.751.4864


    Attorneys for Defendants
    OPENAI, INC., OPENAI GP, LLC,
    OPENAI, LLC, OPENAI OPCO LLC,
    OPENAI GLOBAL LLC, OAI
    CORPORATION, LLC, and OPENAI
    HOLDINGS, LLC

KEKER, VAN NEST & PETERS LLP


By:  */s/ Paven Malhotra*
    Robert A. Van Nest (*pro hac vice*)
    rvannest@keker.com
    R. James Slaughter (*pro hac vice*)
    rslaughter@keker.com
    Paven Malhotra
    pmalhotra@keker.com
    Michelle Ybarra (*pro hac vice*)
    mybarra@keker.com
    Nicholas S. Goldberg (*pro hac vice*)
    ngoldberg@keker.com
    Thomas E. Gorman (*pro hac vice*)
    tgorman@keker.com
    Katie Lynn Joyce (*pro hac vice*)
    kjoyce@keker.com
    633 Battery Street
    San Francisco, CA 94111-1809
    Telephone: 415.391.5400
    Facsimile: 415.397.7188


    Attorneys for Defendants
    OPENAI, INC., OPENAI GP, LLC,
    OPENAI, LLC, OPENAI OPCO LLC,
    OPENAI GLOBAL LLC, OAI
    CORPORATION, LLC, and OPENAI
    HOLDINGS, LLC

## CERTIFICATE OF SERVICE

I declare that I am employed with the law firm of Morrison & Foerster LLP, whose address is 707 Wilshire Boulevard, Suite 6000, Los Angeles, California 90017-3543.  I am not a party to the within cause, and I am over the age of eighteen years.

I further declare that on May 22, 2024, I served a copy of:

**DEFENDANT OPENAI'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS**

 **BY ELECTRONIC SERVICE [Fed. Rule Civ. Proc. rule 5(b)]** by electronically mailing a true and correct copy through Morrison & Foerster LLP's electronic mail system to the e-mail address(es) set forth below, or as stated on the attached service list per agreement in accordance with Federal Rules of Civil Procedure rule 5(b).

Jonathan Loevy
Michael Kanovitz
Lauren Carbajal
Stephen Stich Match
Matthew Topic
LOVEY & LOVEY
311 North Aberdeen, 3rd Floor
Chicago, IL 60607
ai@loevy.com

*Attorneys for Plaintiffs*

I declare under penalty of perjury that the foregoing is true and correct.

Executed at San Dimas, California, this 22nd day of May, 2024.

| Wendy Carpenter | |
|---|---|
| (typed) | (signature) |

# Exhibit 6

**LOEVY + LOEVY**                                    **Stephen Stich Match <match@loevy.com>**

---

## Intercept v. OAI 24-cv-1515 - lift of discovery stay

**Kyle Wallenberg** <wallenberg@loevy.com>                    Mon, Dec 23, 2024 at 10:44 AM
To: Matt Topic <matt@loevy.com>, "Ranieri, Vera" <VRanieri@mofo.com>
Cc: Latham OpenAI Copyright Team <openaicopyrightlitigation.lwteam@lw.com>, OpenAICopyright
<OpenAICopyright@mofo.com>, KVP-OAI <KVPOAI@keker.com>, AI Mail Group <ai@loevy.com>

Hi Vera,

Further to Matt's email below, I've attached two RFPs directed to OpenAI's training set data, which we
served a moment ago. I will email you draft ESI and protective orders early January. Happy holidays.

Best,

Kyle

**Kyle Wallenberg** (He/Him)



Office: (312) 243-5900 / Cell: (630) 370-0054
311 N Aberdeen St, Chicago, IL 60607
**www.loevy.com**

---

**From:** Matt Topic <matt@loevy.com>
**Sent:** Sunday, December 22, 2024 6:51 AM
**To:** Ranieri, Vera <VRanieri@mofo.com>
**Cc:** Latham OpenAI Copyright Team <openaicopyrightlitigation.lwteam@lw.com>; OpenAICopyright
<OpenAICopyright@mofo.com>; KVP-OAI <KVPOAI@keker.com>; AI Mail Group <ai@loevy.com>
**Subject:** Re: Intercept v. OAI 24-cv-1515 - lift of discovery stay

Hi Vera.  The ESI and protective orders from CIR should be fine.  Kyle will put those together and circulate
in early January.  We will serve an RFP for training set data that will basically match the one we served in
CIR and will include the list of asserted works.  From an initial look, the categories you identified as
wanting from us seem to be consistent with what we've agreed to do in other cases, so I don't think that
will be a problem, subject to us seeing the RFPs and reviewing our prior responses more closely.  On the
rest of it, we will plan to get back to you shortly after the new year.  Our firm is closed except for essential
activities from 12/24 through 1/1.

Matt

On Thu, Dec 19, 2024 at 3:35 PM Ranieri, Vera <VRanieri@mofo.com> wrote:

> Matt,
>
>
> Thanks for your patience.  Our responses to your requests are below, as well as our thoughts on discovery from The
> Intercept.
>
>
> **Cross Production:** We can agree to a cross-production from the *Raw Story* case. This would be contingent on The
> Intercept agreeing to an ESI and protective order;  we suggest using the ones governing the *CIR* case.  As to
> production from the News cases, given the differing scope of the cases, we don't think it would be appropriate to cross

produce those materials.  That being said, we're willing to consider specific RFPs and custodians from those cases that you think are relevant in this case.

**Common Crawl Training Data search**: We are open to conducting a Common Crawl URL search and produce the results.  In order to do that, we would need a specific RFP for that information, along with the list of all URLs.  I note that OpenAI is generally closed for two weeks for the holidays.  As a result, we tentatively think we can start this process in January, however we cannot confirm until we get more information from you.  I also note that we're not agreeing at this time that a Rule 26(f) conference is appropriate given the pending Opinion on the motion to dismiss, but we can agree to not object to this specific RFP on the ground that discovery has not yet opened.

**Case timeline**: We tentatively think it makes sense to try to sync up fact discovery timeline with the Class Action/News cases.  Please let us know your thoughts.  This is subject to change in light of the pending Opinion, which may impact the scope of discovery.

**Early Rule 30(b)(6) Deposition:**  We don't think a 30(b)(6) deposition can go forward before we receive a single consolidated Rule 30(b)(6) notice, and we expect that the parties will want relevant document and technical discovery to be further along before taking this type of testimony.

**Initial Discovery from the Intercept**:  In exchange for agreement on the above, we ask that plaintiffs produce the following, which will be relevant to this litigation regardless of Judge Rakoff's opinion: 1) readable and accessible copies of the asserted works, 2) documents sufficient to show the CMI you contend was included with the asserted works and allegedly removed by OpenAI, 3) documents sufficient to show Plaintiffs' ownership of the works at issue; 4) documents related to exclusion protocols.  We will send you specific RFPs seeking these categories of information.

Thanks,

Vera

---

**From:** Matt Topic <matt@loevy.com>
**Sent:** Monday, December 16, 2024 6:02 AM
**To:** Ranieri, Vera <VRanieri@mofo.com>
**Cc:** Latham OpenAI Copyright Team <openaicopyrightlitigation.lwteam@lw.com>; OpenAICopyright <OpenAICopyright@mofo.com>; KVP-OAI <KVPOAI@keker.com>; AI Mail Group <ai@loevy.com>
**Subject:** Re: Intercept v. OAI 24-cv-1515 - lift of discovery stay

**External Email**

---

Hi Vera. Following up on this.

**Matt Topic** (He/Him)

**LOEVY + LOEVY**

Office: (312) 243-5900 / Cell: (773) 368-8812
311 N Aberdeen St, Chicago, IL 60607
www.loevy.com

*Please send any case communications to* blake@loevy.com.

*Encrypted communications available.*

*Click here to schedule a meeting:* https://freebusy.io/matt@loevy.com

On Wed, Dec 11, 2024 at 4:51 PM Matt Topic <matt@loevy.com> wrote:

Hi Vera.  That's a fair point. I'd like to discuss three issues now, though, and hopefully get them either to resolution or impasse before we break for the holidays.

First, we believe OAI should cross produce from the consolidated news cases, not just Raw Story. If you disagree, we'd like to know the basis.

Second, we'd like to discuss the ready-for-trial date. Judge Rakoff's default is five months.  In our 26(f) report, we asked for essentially 11 months, and he told us at the Rule 16 conference that he'd give us some additional time beyond his default but "nowhere near" what we asked for. We think 8 months is as long as he'd likely give us, especially since the Microsoft claims and (b)(3) claims have been dismissed.  So we'd propose September 1, 2025, assuming that the opinion issues by January 1.

Third, regardless of how the opinion reads, we're confident that we will need discovery into the existence of our content in your training sets. We'd like to get the ball rolling on receiving a common crawl production comparable to what we received in Raw Story, and would like to get that by January 15.  We would also like to schedule a 30(b)(6) shortly thereafter on the following topics so we can hopefully put this part of the case to bed early on, at least for the common crawl sets: *(1) Explain how it is that the Intercept materials identified in* OAI's *training set productionS came to exist in the form they exist in those training sets.  (2) Explain why the materials in the training sets do not have author, title, copyright notice, and terms of use information.*   We can discuss the exact wording of that, of course.

On Wed, Dec 11, 2024 at 3:19 PM Ranieri, Vera <VRanieri@mofo.com> wrote:

Hi Matt,

Following up here, we think it's important for the parties to receive the benefit of the opinion before proceeding into discovery as that may have an impact on the scope of discovery.   That being said, OpenAI is open to discussing what discovery makes sense while we wait for that order, including for example a cross production of materials produced in the *Raw Story* case.

Let us know,

Vera

**From:** Matt Topic <matt@loevy.com>
**Sent:** Monday, December 9, 2024 9:36 AM
**To:** Latham OpenAI Copyright Team <openaicopyrightlitigation.lwteam@lw.com>; OpenAICopyright <OpenAICopyright@mofo.com>; KVP-OAI <KVPOAI@keker.com>
**Cc:** AI Mail Group <ai@loevy.com>
**Subject:** Intercept v. OAI 24-cv-1515 - lift of discovery stay

**External Email**

---

Counsel:

As you'll recall, the court stayed discovery pending the outcome of the motion to dismiss. We think the stay should now be lifted, and that the court should set us for a Rule 16 conference to set a schedule.  Please let us know your position.

Matt

--

**Matt Topic** (He/Him)

Office: (312) 243-5900 / Cell: (773) 368-8812
311 N Aberdeen St, Chicago, IL 60607
**www.loevy.com**

*Please send any case communications to blake@loevy.com.*

*Encrypted communications available.*

*Click here to schedule a meeting:* https://freebusy.io/matt@loevy.com

===================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's Privacy Policy.
.

--

**Matt Topic** (He/Him)

 **LOEVY + LOEVY**

Office: (312) 243-5900 / Cell: (773) 368-8812
311 N Aberdeen St, Chicago, IL 60607
www.loevy.com

*Please send any case communications to blake@loevy.com.*

*Encrypted communications available.*

*Click here to schedule a meeting:* https://freebusy.io/matt@loevy.com

====================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's Privacy Policy.
.

--
**Matt Topic** (He/Him)

**LOEVY + LOEVY**

Office: (312) 243-5900 / Cell: (773) 368-8812
311 N Aberdeen St, Chicago, IL 60607
www.loevy.com

*Please send any case communications to blake@loevy.com.*
*Encrypted communications available.*
*Click here to schedule a meeting:* https://freebusy.io/matt@loevy.com

**2024.12.23 - Intercept 1st Set of RFPs (Nos. 1-2).pdf**
169K